SAUL BASS & ASSOCIATES, a
California corporation,

v.

The UNITED STATES.

No. 373–68.

United States Court of Claims.
July 19, 1974.

 

Jordan A. Dreifus, Los Angeles, Cal., attorney of record, for plaintiff.

Bernard M. Brodsky, Buffalo, N. Y. with whom was Asst. Atty. Gen. Carla A. Hills, for defendant.

Before COWEN, Chief Judge, and SKELTON and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's exceptions to a recommended decision filed August 29, 1972, by Trial Judge David Schwartz, pursuant to Rule 134(h) and to his supplemental opinion filed September 20, 1973, pursuant to Rule 134(h) and an order of the court of March 5, 1973. The court has considered the case on the briefs and oral argument of counsel. Since the court agrees with the recommended decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case with the following additions:

As shown in paragraph three of the letter of intent of December 21, 1962, the letter of intent was merely an agreement to begin work on the project. The parties did not intend to incorporate the proposed Design Agreement in full, but only in part, because the proposed Design Agreement was still under negotiation. Plaintiff argues that the provision for attorney's fees in the draft Design Agreement was incorporated in the letter of intent by the broad language in paragraphs one and four of the December 21st letter and that the attorney fee clause is remedial in nature, applying to both the design and production portions of the contract. We cannot accept plaintiff's interpretation.

While there are broad references to the proposed Design Agreement in the letter of intent, the letter of intent is not a detailed expression of the obligations of the parties, nor are the references to the draft Design Agreement intended to make the letter of intent anything more than a preliminary

agreement. The letter of intent refers to paragraphs 1, 2a, and 2b of the Design Agreement. These provisions in the Design Agreement basically provide a description of the nature of the project and a description of the work to be done in the initial stages. Neither the letter of intent nor any of the surrounding circumstances give any indication that the provision for attorney's fees was made a part of the preliminary agreement in issue. In this situation, we cannot speculate on which portions of the draft Design Agreement were incorporated into the agreement. Consequently, we agree with our trial judge's construction of the letter of intent to include in the preliminary agreement only those provisions of the proposed Design Agreement which describe the work to be done and which have been referred to, at least in part, in the letter of intent.

In a subsequent hearing, the trial judge determined that plaintiff had presented the actual "story board" involved in this case to the court and that the clerk would deliver the "story board" to the defendant at the conclusion of the case. This satisfies the condition for plaintiff's recovery herein, and judgment is entered for plaintiff in the sum of $22,787.72. Plaintiff's claim for attorney's fees is dismissed, and defendant's counterclaims are dismissed.

## OPINIONS OF TRIAL JUDGE

SCHWARTZ, Trial Judge:

Plaintiff Saul Bass & Associates, a California corporation, sues for a balance due under an alleged contract with the United States Commission for the 1964 World's Fair for the design of the Government's exhibit at the Fair. The Government counterclaims for a sum including its advances to plaintiff on the theory that there was no contract and if there was one, plaintiff failed to perform it. It is here held that the dealings between the parties did constitute a contract and that plaintiff is entitled to judgment for a balance of $22,787.72,

found to be due, upon delivery by plaintiff to defendant of a certain "story board" which under the contract became the property of defendant.

The U. S. Commission—N. Y. World's Fair, was established in 1962 as a constituent agency in the Department of Commerce and pursuant to statute empowered by executive order to design, construct and operate the United States Pavilion and exhibits at the Fair. 22 U.S.C. § 2452(a)(3); Executive Order 11014, April 17, 1962, 3 CFR 593 (1959–1963 Comp.), 27 FR 3731 (1962); Dept. of Commerce Order No. 180, Aug. 7, 1962 (27 FR 8334 (1962)). The approximately $17 million appropriated for the overall project was divided into three parts, one to be used for the building, another for the exhibits and the third for operation and maintenance.

On August 6, 1962, plaintiff Saul Bass & Associates (henceforth "SBA") submitted to the Commission a proposal for the design and construction of the exhibit on the upper level of the U. S. Pavilion at the Fair. SBA was chosen to do the job on the basis of the concept it proposed and its experience and excellent reputation in its special fields of industrial design and the production of short films.

SBA proposed that the exhibit should be a multimedia production involving a number of motion picture and slide projections, together with sound devices. The presentation would be viewed by small groups of visitors riding in a vehicle through an exhibit area divided into a number of segments. These segments would be so insulated from each other, that there would be presented in each— in effect continuously as the vehicle moved along—a separate production of a minute or less in duration. The spectators would thus experience successive environments composed of visual and aural phenomena. The theme was to be the conditions of modern life, sociologically treated, with emphasis on the growing problems of man's environment and possible solutions to the problems.

On the completion of design, the Commission would enter into a contract or contracts for production—that is, the shooting of the film and the procurement, fabrication and installation of the physical elements of the exhibit. Such a contract would be made either with SBA alone or with SBA as supervisor and with various other organizations.

While SBA had a number of designers and other creative persons in its employ, it was understood that the detailed planning—called design—of the exhibit would involve the coordination of the work of a number of experts as consultants, subcontractors or in some other relationship in such fields of films, lighting, sound and the mechanical "ride." The design proposed would involve relatively new and complicated techniques, equipment and effects, and would be costly to realize.

SBA's work would be both creative and fiscal, that is, it would prepare a story, script and design for the exhibit, upon the basis of estimates of the cost of the various elements, within the amount expected to be available. The Commission's representatives gave SBA to understand that an amount in excess of $3 million or about $3.5 million would be available as a budget for production.

Upon the selection of SBA, representatives of SBA and the Commission set about negotiating the details of a formal contract. Time, however, was short and SBA did not wait to begin work for a formal contract. The Executive Order having made appropriate waivers of procurement restrictions, the parties signed a letter of intent dated December 21, 1962.

While they expected that they would soon agree upon and execute a formal contract, and they negotiated continually until their relationship ended in May of 1963, no formal contract was ever signed. The letter of intent was several times extended in writing, each time for a longer period, the last one, on March 15, 1963, extending the original letter until May 1, 1963. In May, SBA withdrew from the project, maintaining that its agreed work of design was completed and that it did not choose to negotiate further a possible contract for the production phase.

The parties fell out, as client and designers so often do, by reason of an irreconcilable disparity between the client's means and the designer's plans. As noted, SBA was told that about $3.5 million would be available for the exhibit it would design. It did its work of designing and obtaining costs estimates accordingly. Beginning in March 1963, however, the Commission, primarily through Deputy Commissioner Nathan Ostroff, made a series of requests, more and more urgently put, that SBA effect substantial reductions in the estimated costs of the exhibit. The reason was that the total appropriation for the Fair was fixed (without hope of an increase) and an unexpected overrun in the cost of the building had shrunk the amount available for the exhibit from $3.5 to $2.5 million.

SBA had held frequent discussions of costs with its consultants and proposed subcontractors and with the Government representatives, and had made a number of internal reviews of costs estimates, all in an effort to reduce costs and thereby produce a lower budget. It now undertook a further review, in response to Mr. Ostroff's requests. The culmination of its efforts, made in a good faith desire to comply with its client's financial stringencies, was an estimate of $3,376,155 submitted on April 12. This budget reflected substantial reduction in a number of the items from earlier estimates. One of the reductions, in my opinion particularly demonstrating SBA's good faith, was a reduction in SBA's proposed fee from $115,000 to $85,000.

On May 6, 1963, SBA made a detailed presentation of its design to President Kennedy, at a meeting in the White House. The design found favor with the President and his advisers, and the Commission approved it. The Commis-

sion's representatives continued, however, to press requests for reduction costs, accompanied by suggestions on how economies could be effected. SBA explored each of the suggestions, found them impracticable and rejected them, only to have further such suggestions made. Both sides were, it should be said, acting properly and in good faith, in compliance with pressures not of their own making. One of the suggestions made and explored shows how unlikely were the hopes of substantial economies. The Commission suggested that some of the movie-making equipment for the exhibit might be borrowed from the Signal Corps. SBA dutifully investigated, spending some time on the possibility, only to find that the Signal Corps did not have the sophisticated equipment which was needed, equipment hardly yet available commercially.

Matters came to a head soon after the White House presentation. The current (and last) extension of the letter of intent had expired on May 1, 1963. By telegram on May 12, Mr. Ostroff reminded SBA of the "tight budgetary situation fully disclosed to you" and said that while the Commission was prepared to meet with SBA to make a contract for production, the Government could not be expected to pay rates normally associated with profit-making. SBA was requested to inform the other consultants of this, and to consider the "size, duration and importance of the project, its high public service aspects, including direct interest of President, its extraordinary public relations potential and other special considerations which require our insistence upon much lower than usual rates for all services involved." Three days later Mr. Ostroff telegraphed much the same message, asking SBA to review its estimate and submit an additional breakdown. He added: "Candor requires me to state that such review must result in significant reduction in earlier estimate these purposes to provide basis for final resolution these matters."

SBA felt it impossible, consistently with its own standards and reputation, to accede to the Commission's insistence upon large cuts in costs, in the light of the nature of its design and what it regarded as the inevitable costs of the project. Accordingly, SBA responded that in view of the history of the negotiations and the recent requests further to review costs, it did not believe that agreement would be reached on a contract for production, in the time remaining before production must begin, and that it therefore withdrew from the project.

The Commission thereafter contracted with Cinerama, Inc., for an exhibit on a different theme, for a sum within the available funds. Relations between SBA and the Commission ended with SBA refusing to turn over the story board for the production (a series of pictorializations on cardboard giving a running version of the production) and the Commission refusing to make further payments. Each side made demands on the other for performance claimed to be due, and each refused to comply.

SBA maintains that the papers exchanged between the parties constituted a binding agreement for the design by it of the exhibit, for an agreed fee, which it earned by the completion of the work with the approval of the Commission, and that it is entitled to the unpaid balance of the fee and its incurred outside costs and to its attorney's fees in this litigation. SBA claims $85,000 as its fee, outside costs of $89,004.25 and travel expenses of $3,060.37, a total of $177,064.62, less advances received of $152,500, a net balance of $24,564.62, plus attorney's fees in the amount of some $19,000.

The Government maintains that no contract existed—that the letter of intent and its extensions were insufficiently definite to constitute a contract and were merely preliminary to a contract; that they were to be contractually operative only if and when the parties would finally agree on the terms of a

contract and formally enter into such a contract.

If, the Government continues, a contract for design did exist, the $85,000 mentioned in the papers was not a fixed fee but a maximum and, moreover, SBA did not fully perform. In counterclaims premised on its legal position the Government seeks a refund of the $152,500 advanced under the letter of intent and also what it calls "excess costs" of the Commission's procurement services from Cinerama, Inc., services which it is said were under the contract to be supplied by SBA at a lesser cost.

■ 1. *Existence of a Sufficiently Definite Contract.* The resolution of the question as to whether the parties entered into a contract sufficiently definite for enforcement requires a statement of their several writings in some detail.

The first of these is a Design Agreement prepared by plaintiff in October. Though never signed, its first two paragraphs were referred to in subsequent writings which were signed. These paragraphs, set out in the note,[1] provided that the contract work to be done by SBA as designer should consist of (a) the design, and at the Commission's later election, the production of a film 15 to 30 minutes long, for use at the Commission's exhibit at the Fair, to be

"composed of motion pictures, slides or a combination thereof," "presently contemplated to involve multiple projection techniques and is intended to depict the essence of our national heritage and operations," and (b) the creation of the physical interior of the exhibit, including the ride during which spectators would see the film.

At the time of the proposed Design Agreement it was contemplated that the ride through the exhibit area would be designed by a firm which had made a joint proposal with SBA. That firm soon dropped out, and SBA became responsible, in the first instance, for the entire project—both film and ride, although it would actually produce only the film.

Next is what is called the original letter of intent of December 21, 1962 from the Commission to SBA, written pending a formal agreement for the work provided for in the Design Agreement, and authorizing SBA to "undertake and continue contract performance, including the placing of orders for materials and supplies."

The letter, which needs to be stated in full, read as follows:

■ Pursuant to our discussion of today of your letter of October 13, 1962, to Mr. George and your proposed "Design Agreement" (draft of October 27, 1962, both documents in-

---

1. Paragraphs 1 and 2 of the proposed Design Agreement read as follows:

"1. Client has engaged Designer to design and, at Client's later election, to produce a film (whether composed of motion pictures, slides or a combination thereof), hereinafter referred to as "film", for use as a part of Client's exhibit at the New York World's Fair, 1964–65. Said film is presently contemplated to involve multiple projection techniques and is intended to depict the essence of our national heritage and aspirations. Its running time is to be not less than 15 minutes nor more than 30 minutes.

"2. Designer's responsibilities in connection with the pre-production stage of its work under this agreement will be carried out by

"(a) the creation and submission to Client of a story board and a tentative script for said film, which submission will be in such form and character as in Designer's opinion shall be sufficient for Client's needs; and

"(b) during the period prior to such submission, the collaboration on (and, where Designer finds it essential) the design of the interior facilities of Client's exhibit to such degree that, in Designer's opinion, the party or parties responsible for construction and development of such interior facilities (such party presently being W. B. Ford Associates, of Detroit) shall have been enabled to present to Client, by the time of the aforesaid submission, models, diagrams and/or mock-ups sufficient to indicate generally to Client the nature, sequence and flow of the ultimate film presentation to the public. Client guarantees that in its arrangements with said party or parties the latter will assume the responsibility to work with Designer along the lines and to the end indicated in this subparagraph (b)."

corporated herein by reference), this is to notify you of our intent to enter into a contract with you for the services in substance as stated in paragraph number 1 of said draft.

■ The terms of said contract will be mutually agreed upon with due regard to the fact that the Commission is an agency of the U. S. Government.

■ This Letter of Intent is to be effective as of September 1, 1962, and is issued pending final development and agreement as to details of the contract, because of the urgency to complete action under the proposed contract in sufficient time to insure meeting the opening date for the New York World's Fair.

■ Upon your agreement to undertake performance of work in accordance with the above provisions, particularly subparagraphs 2a and 2b thereof, this Letter of Intent is your authority to undertake and continue contract performance, including the placing of orders for materials and supplies.

■ This letter is subject to an over-all aggregate limitation of $152,500 for design, development and direction services, and outside costs, of which not over $110,000 shall be allocable to outside costs, and not over $42,500 to your design, development and direction services, all payable upon appropriate vouchers.

■ An advance payment of $52,500 will be payable upon execution of this letter and your vouchers may be immediately presented therefor.

■ It is expected that a contract will be executed on or before January 15, 1963. If said contract is not executed at said time, this letter will expire (subject to any balance due of said $152,500) at the option of the

Commission, without further liability of either party, or said letter may be extended on terms mutually agreed upon. At time of expiration of this letter (as its time may be extended) if no contract has been executed, designer will submit its report as to status of the project.

■ Two weeks from this date you may submit an additional voucher for outside costs, within said limitations, to be payable upon approval of said voucher.

■ This action is negotiated pursuant to Public Law 87–256 approved September 21, 1961, Executive Order 11014, issued by the President April 17, 1962, and Department Order No. 180 issued August 7, 1962.

■ This Letter of Intent confirms U. S. Commission telegram dated December 21, 1962 to Saul Bass & Associates, Inc.

The letter was accepted by SBA on December 31, 1962. Work had been going on for some time—presumably since September 1, 1962, the effective date of the letter. Plaintiff now submitted vouchers to the Commission, pursuant to the letter, and was paid. Work continued, and negotiations for a formal contract went on steadily, parallel with the work of design. Drafts of an agreement and budgets were prepared, submitted and exchanged, but agreement on a formal contract never came. Time passed, and no final version of a contract was agreed upon.

On January 15, 1963, the expiration date of the letter of intent, it was extended to February 1, 1963 and a clause was added requiring, if the letter of intent expired without a contract having been signed, that SBA turn over all tangible products of its pre-production work.[2] On January 31, 1963 the expira-

2. "In the event that a contract is not executed at the expiration of said letter as amended herein, as a result of your decision to withdraw, you will turn over to the Commission (together with your status report mentioned therein) all tangible results of your pre-production efforts under said letter of intent (including such items as models, drawings, sketches, reports of engineers and all other consultants, scripts and story outlines)."

tion date was further extended, to March 1, 1963, and the monetary limitations in the original letter—$110,000 for outside costs and $42,500 for SBA's services—were revised to become $100,000 for outside costs and $52,500 for SBA's services.

A final extension letter dated March 15, 1963 made further amendments to the original letter of intent, as follows:

1. The date of expiration thereof [the letter of intent] is extended from March 1, 1963 to May 1, 1963; and,

2. The figure $52,500 is increased to $85,000 as fees payable for your services and $100,000 is increased to $115,000 for allocation to outside costs (see the 5th paragraph of the letter of 12/21/62 as amended by letter of 1/31/63); and,

3. The scope of your services is broadened from those indicated in the first paragraph of the letter of 12/21/62 to include other design, development and direction services in subparagraphs IA1 through 7 of the "General description * * *," etc. of your services accompanying your letter to Mr. Gazik dated 1/31/63 and paragraph 2 of the above referenced amendatory letter of 1/15/63 is hereby also made applicable to the results of your services so broadened; and

4. Further, a sum equal to 12 and ½ percent of the "outside costs," specified in paragraph 2 of this letter, actually expended in lieu of overhead, handling, administration, accounting, legal costs and fees necessary in connection with such outside costs, shall be payable to you.

These several letters were not merely negotiations preliminary to the making of a contract, too indefinite for enforcement. The Government's contentions concerning the existence of a contract are rejected.

The courts are familiar with the type of cases in which the parties engaged in merely preliminary negotiations, committing themselves to nothing, and intending to be bound only upon signature of a formal contract. *E. g.*, Banking & Trading Corp. v. Floete, 257 F.2d 765 (2d Cir. 1958); Byrne Organization, Inc. et al. v. United States, 287 F.2d 582, 586, 152 Ct.Cl. 578, 585 (1961); Abbell v. United States, 166 F.Supp. 602, 143 Ct.Cl. 556 (1958). Equally familiar, however, are other cases in which informal and even scrappy writings express the parties' intention to be bound, despite their continuing efforts to agree upon a detailed and formal contract. *E. g.*, American Smelting Co. v. United States, 259 U.S. 75, 78, 42 S.Ct. 420, 66 L.Ed. 833 (1922); Penn-Ohio Steel Corp. v. United States, 354 F.2d 254, 173 Ct.Cl. 1064 (1965).

■ The intent of the parties, as always in the law of contracts, is determinative, the question being whether the parties intended *not* to be bound or whether either of them manifested an intent to the other not to be bound until a fully integrated contract had been executed. 1 Williston, Contracts (3d ed.) §§ 27, 28, 28A; Restatement of Contracts (1932) §§ 25, 26.

Considering their haste and informality, the letters exchanged by the parties express with reasonable clarity, not only an intention to be bound but also terms sufficiently definite for performance and enforcement. The work plaintiff is to do is described, provision is made for payment, and the duration of the agreement is specified.

The heart of the agreement is found in paragraphs [4] and [5] of the original letter of intent and paragraph 3 of the extension of March 15, 1963, all set out above.

Paragraph [4] of the original letter contained an agreement by the parties that SBA should perform the work of design, described by reference to the opening paragraphs of the proposed Design Agreement, quoted in note 1, supra. Upon acceptance of the letter of intent, SBA got, by paragraph [4], "authority to undertake and continue contract per-

formance, including the placing of orders for materials and supplies." Surely this is the language of binding agreement and of legal contract. In paragraph [5] the Commission put a limit of $152,500 on its liability for this work of "contract performance," dividing the total between $110,000 for outside costs and $42,500 for SBA's own services. An advance of $52,500 accompanied the letter.

Paragraph [7] speaks of the expectation that a contract will be executed by January 15, 1963—within 3 weeks—but goes on to provide that if no contract is executed, "this letter will expire (subject to any balance due of said $152,500) * * * without further liability of either party." These words confirm that some liability existed while the letter was in force, and some would continue beyond the expiration of the letter, that is, a liability to pay the "balance due of said $152,500."

■ The law rejects post facto claims that agreements are too indefinite for enforcement, where the parties knew what each of them was to do under the contract and some standard exists to measure performance. Sylvania Electric Products, Inc. v. United States, 458 F.2d 994, 999, 198 Ct.Cl. 106, 115 (1972). The agreement expressed was sufficiently clear to the parties so that SBA could and did begin work and the Commission could and did make substantial payments on account, to the point where the design—the completed work—was presented to President Kennedy and approved by him and by the Commission, which paid SBA advances to a total of $152,500. The original letter of December 21, 1962 is therefore held to have created a contract for services in which defendant agreed, upon submission of vouchers, to pay up to a specified sum for work on the design phase during a specified period of time. The letters of January 15, and January 31, 1963 extended the time, raised the monetary limitations, and added a provision requiring the turnover of the results of the work performed, if a contract were

not executed. The extensions did not change any of the essential terms.

The original letter, as noted, did not speak of a single fee for design but rather of an overall aggregate limitation of $152,500 on payments for design, development and direction services, of which "not over $42,500 shall be allocable" to "your design development and direction services." These words have the flavor of payment on account, of partial payment for partial work. Words such as fee, connoting a single total payment for the completed job, were not used, doubtless because the parties expected that within a month the letter would be replaced by a formal contract, long before the design would be completed and before a fee for design would be fixed. It would be time enough in the formal contract to price the completed job of design.

As negotiations were prolonged, and the letter of intent was three times extended, to February 1, to March 1, and May 1, 1963, it became progressively more clear that SBA's design would be completed under a letter of intent and not under an agreed formal contract. This growing recognition is first apparent in the clause added to the letter of January 15, providing that if a contract were not executed on the expiration of the letter as amended, SBA would turn over the product of its efforts. The original letter had called only for a status report to be made.

By mid-March, completion of design was coming closer and closer and yet a formal contract for production was becoming more difficult to realize, for lack of available money. Tacitly abandoning any expectation that a formal contract covering design and production could be agreed upon while the work of design was still going on, the parties extended the letter of intent for three more months to May 1, 1963, a period long enough to cover the completion of the design.

On an extension for so long a period it became appropriate to fix SBA's total

fees. Fees for SBA's design had been under discussion for some time, and the parties had reached agreement, on $85,000. The Commission had come up from its "allocation" of $52,500 and SBA had come down from its demand for $115,000.

Accordingly, the letter of March 15 stated:

> 2. The figure $52,500 is increased to $85,000 as fees payable for your services and $100,000 is increased to $115,000 for allocation to outside costs (see the 5th paragraph of the letter of 12/21/62 as amended by letter of 1/31/63) * * *.

Comparison of this language with the language amended, in paragraph [5] of the letter of December 21, shows that the allocation language was retained for outside costs but was dropped for the payments to SBA for its own costs or services. The earlier figure of "not over" $52,500, in paragraph [5] of the original letter, there described as allocated for SBA's design services, was now increased to $85,000 "as fees payable for your services." This language bespoke the parties' agreement upon a fee of $85,000 for the completed design.

The construction here given the papers exchanged between the parties has been gathered not only from the words of the progressive provisions of the four letters involved but also from the surrounding circumstances, including the negotiations specifically directed to SBA's fee.

■ 2. *Performance.* If there was an agreement for design, for a fee of $85,000, and it is held that there was, the Government then claims that SBA failed to perform the agreement.

There was some testimony on behalf of the Government to the effect that the design was unfinished when SBA withdrew—that SBA was not ready and able to begin production. Such an argument is not emphasized in the briefs, and if it were it would not prevail. The evidence is that while refinement of the design would continue during the production

phase, design and production are two separable phases, and the *dividing* line between the two is the presentation of the design to the client and its approval at a time when the designer is ready, able and willing to begin production. The heavy preponderance of the evidence is that the line was reached—design was finished.

The design was presented to the President on May 6, 1963, with the use of a script, a story board and a small model, at a meeting attended by Presidential advisers August Heckscher and Arthur Schlezinger, Jr., and ranking officers of the Commission and the Department of Commerce. The President liked the presentation sufficiently for the Commission to approve it shortly after the White House meeting. At that time, SBA was ready, willing and able to begin actual production, subject, of course, to the Government's ability to provide financing, which was not forthcoming.

■ 3. *Alleged Breach.* It cannot be said that SBA breached the contract by its refusal to continue with the production phase of the work. The contract in terms left SBA free to withdraw on the expiration of the letter of intent without the execution of a formal contract.

In the portion of the draft Design Agreement (note 1, *supra*) referred to in the original letter of intent, it is said that "Client has engaged Designer to design and, at Client's later election, to produce a film * * *." Had the parties signed a contract for design and production which contained such a clause, and had SBA designed a film whose production the Commission could and wanted to finance, SBA might have been unable to abandon the project. But such an eventuality did not occur. Instead the parties signed a letter limited to design, whose very function was to start the work going while agreement was sought on a detailed contract. When that letter expired without being succeeded by a formal contract, and the Commission was unable to finance the

film designed by SBA, the relationship of the parties came naturally to an end.

The first relevant reference in the original letter of December 21 is somewhat inconclusive. Paragraph [7] of the letter states that "If said [formal] contract is not executed at said time [the expiration date of the letter of intent] this letter will expire (subject to any balance due of said $152,500) at the option of the Commission, without further liability of either party, or said letter may be extended on terms mutually agreed upon." This language points both ways—to a Commission "option" to extend the letter and, also, to an extension mutually agreed. A unilateral option in the Commission and an extension mutually agreed are of course antithetical.

The next and final sentence of paragraph [7] imposes on the designer, at the expiration without agreement on a formal contract, a duty to "submit its report as to status of the project."

The designer's right to cease work on the expiration of the letter is made all but explicit in the extension of January 15 by the addition to SBA's obligations of a duty to turn over to the Commission the tangible products of its work, if a contract is not executed at the expiration of the letter of intent as amended "as a result of your [SBA's] decision to withdraw." These words "your decision to withdraw," in the amendatory letter overcome the tendency of any other language, such as that quoted from the Design Agreement, suggesting that SBA could not withdraw when its design was complete and the letter of intent expired.

SBA may, however, have had a duty to negotiate in good faith for a detailed contract, once it signed a letter of intent as a device for starting work while negotiations continued for a detailed contract. Compare Henry G. Meigs, Inc., v. Empire Petroleum Co., 273 F.2d 424 (7th Cir. 1960) with National Tea Co. v. Weiss, 341 F.2d 331, 334 (7th Cir. 1965) and Oil Trading Associates, Inc. v. Texas Refining Inc., 303 F.2d 713 (2d Cir. 1962).

Any such duty was performed. SBA completed the design, and it withdrew only when the premises of all its work were changed without its fault. It had designed an exhibit which would cost $3.3 million, on advice from its client that such a sum would be forthcoming. Now it was told that its client could afford only $2.5 million and it was asked to make significant reductions of such kind and in so insistent a manner as meant a redoing of all, or most of its work and a sacrifice of financial profit, all to an end which would not enhance and might damage its reputation. Good faith did not require that SBA so disadvantage itself.

In one respect only did SBA depart from its obligations. It failed to turn over some of the tangible results of its work of design as required by the letter of intent, as amended by the extension of January 15. That extension in plain words said that if SBA withdrew at the expiration of the letter of intent as amended and a contract were not executed "you [SBA] will turn over to the Commission (together with your status report mentioned therein) all tangible results of your pre-production efforts under said letter of intent." SBA did not do this.

The parties ended their relationship acrimoniously. The Commission made a sweeping demand for script, story board and all other results of SBA's work, meanwhile refusing to pay remaining balances due to plaintiff. SBA reciprocated by refusing the demand and demanding payment, on its part claiming that the Commission had no rights to any of the product of its design efforts, and that it was entitled to the fee of $85,000 even if its work was unsatisfactory to the Commission.

SBA contends that the quoted clause from the letter of January 15 requiring turnover is inapplicable because a contract was not executed as a consequence of the reduction in defendant's funds, and not because of an SBA "decision to withdraw." The argument has some force, but not enough to free SBA

from the explicit obligation to turn over the results of the design work constituting performance of the agreement for which it was to receive a fee of $85,000. SBA cites nothing supporting the notion that having performed a contract to make a design, for a fee of $85,000, it is entitled to keep the design and to be paid its fee, for the sole reason that the client ran out of funds to produce the exhibit.

■ SBA's refusal to turn over the product of its design work was justified, however, at the time. The Commission owed it a balance of money under the letter of intent, and was refusing payment. SBA's obligation to deliver the tangible products of the design was, under the arcane theories of law applicable to mutual nonperformance, dependent upon payment of a balance being refused, and thus the failure to perform on the one side was excused by the failure to perform on the other. See 6 Williston, Contracts, *supra*, §§ 812–86; Restatement, Contracts, *supra*, §§ 266–90. It is not excusable once this action is brought. That is, SBA will not be permitted to recover the unpaid balance, as it prays in this case, without compliance with its obligation to turn over the quid for which it seeks the total $85,000 quo.

The actual withholding of tangible products of the work turns out, an examination, to be limited to the story board alone. The extreme position first taken by SBA was tempered as time went on, and it complied with such requests as Cinerama made for access to the tangible products of its work.

Scrips and drawings had already been furnished, in copy form, to the Commission's representative for design, as they were produced. Only the story board, apparently a unique item of which there was no copy, was retained by SBA and not turned over to the Commission. Script and story were made useless to the Commission by the decision that the exhibit to be produced by Cinerama should be based on a different story than SBA was to use. Even the reten-tion of the story board, therefore, carried no increase in costs or other harm or damage to the Commission.

In the accompanying findings it is therefore found that all products of SBA's design work except the story board were in fact made available or turned over to the Commission or to Cinerama on behalf of the Commission and that the failure to turn over the story board caused no damage to the Commission. The failure, excusable at the time, is not now excusable. Under the contract, however, the story board became the property of the Commission, subject to its payment of what it owed, and the story board must be delivered to the Government if SBA is to be paid the judgment for the balance due under the letters of intent. Comparable conditions on money judgments are not unknown in this court. Jensen v. United States, 305 F.2d 444, 449, 158 Ct.Cl. 333, 342 (1962); Bowser Delaware Corp. v. United States, 193 Ct.Cl. 1105 (1970). The money judgment for SBA will therefore be subject to delivery of the story board to the Government.

■ Last to be considered is SBA's claim for $19,017.02 as its attorney's fees in this cause. The claim is rested on the last clause of the proposed Design Agreement, providing that: "In the event of controversy between the parties under the terms hereof, the successful party in any litigation of such controversy shall be entitled to its reasonable attorney's fees in connection therewith."

Had the parties bound themselves to the agreement of which this clause is a part, a question would arise as to whether SBA could be said to be "successful" in this litigation and whether, as the Government claims, engagement to such a clause was beyond the powers of the Commission. See 28 U.S.C. § 2412 (1970). The clause is, however, not a part of any contract between the parties. It is to be found only in a detailed agreement proposed by plaintiff which was to be the subject of negotiations,

which negotiations never culminated in an agreement.

The parties bound themselves only to the letter of intent and to the letters amendatory thereof. While the opening words of the letter of intent spoke of "your [SBA's] proposed Design Agreement" as "incorporated herein by reference," the incorporation intended was not an incorporation of the proposed agreement in the sense of an agreement already binding or now by the incorporation to be made binding. The proposed Design Agreement was incorporated for just what it was—a proposed agreement. The only parts of the proposed Design Agreement incorporated into the letter of intent as binding agreements were paragraphs 1 and 2, explicitly employed in the letter of intent to describe work to be done.

The clause for attorney's fees is thus not a part of the agreement made and cannot support a claim for fees. After all, the very reason for the letter of intent was that the parties wanted to begin negotiations on the details of an agreement such as SBA had proposed; they did not mean, by signing the letter of intent, to adopt the proposed Design Agreement as their detailed agreement.

Finally, damages. The Government has in a pretrial audit of plaintiff's books verified $86,612.58 of the claimed outside and travel costs of $92,064.62. On trial, plaintiff proved an additional $3,675.14 of such costs, bringing the total to $90,287.72; adding the agreed fee of $85,000, the claim is proven to the extent of $175,287.72. Subtracting the advance of $152,500, the balance is $22,787.72, to which plaintiff is entitled on delivery to defendant of the story board mentioned above.

### SUPPLEMENTAL OPINION *

SCHWARTZ, Trial Judge:

On August 29, 1972, an opinion, proposed findings of fact and recommended

conclusion of law were reported, in which it was concluded that plaintiff is entitled to judgment against the Government in the sum of $22,787.72, "subject to delivery to defendant's counsel of the certain story board referred to in the findings and conclusions."

The nature of the action and of the controversy is described in the earlier report. Here it need only be said that the action is upon a contract for the design by plaintiff of a film to be shown in the Government pavilion at the New York World's Fair of 1964; the immediate controversy is over the story board which was the subject of the condition in the recommended judgment.

A story board, or at least the story board here involved, is a pictorial exposition of the script. Physically it is a collection of some dozens of photographs, garnered from film libraries and many other sources, and in some cases drawings, all deemed by the designer of the film to be suggestive of what is intended by the script and what is to be accomplished in the actual shooting of the film. Unlike the script, the story board is unique—that is it has no copies—and the photographs of which it is composed are neither numbered nor otherwise integrated into a set form.

Following the report of August 29, 1972, a dispute arose between the parties as to whether the story board to be tendered by plaintiff was the actual and complete story board required as a condition of the judgment to be delivered to the defendant. Both parties made motions to reopen proof on this subject and the court on March 5, 1973, ordered that the motions be referred to the trial judge for such action as he deemed appropriate, including among other things the reopening of the case and the taking of additional proof, and supplemental report.

After preliminary proceedings and conferences, proof was reopened and a hearing was held on April 4, 1973, on the

---

* An earlier report submitted an opinion, findings of fact and recommended conclusions of law in accordance with Rule 134(h). The instant report is submitted pursuant to Rule 134(h) and an order of the court filed on March 5, 1973.

issue, which was agreed to be whether the story board informally tendered by plaintiff, and produced in court, was the authentic, complete story board whose delivery was contemplated by the condition of the recommended judgment. Following the hearing, the issue was briefed on findings of fact proposed by both parties.

At the hearing, Mr. Saul Bass, head of plaintiff corporation, appeared as a witness for plaintiff and with the tendered story board in hand testified unequivocally that it was the actual and complete story board which he, as head of plaintiff, had created and had produced and expounded before President Kennedy at the meeting in the White House on May 6, 1963, described in the earlier opinion. The Government responded with opinion testimony by a high-ranking Government lawyer who had heard the presentation to the story board to President Kennedy, that in his opinion the proffered story board was incomplete, formless, unfit for use, and to the best of his recollection not the story board presented to President Kennedy. The opinion, incidentally, was given by affidavit and was admitted in evidence by agreement. The affiant thus did not have the benefit of Mr. Bass' testimony.

■ It is found that the story board tendered by plaintiff is the actual, complete story board and thus meets the condition of the recommended judgment.

I have not the slightest doubt—and I do not believe that reasonable men having heard Mr. Bass could have any doubt—that the tendered story board is the actual story board, complete and authentic. The Government's doubts are perhaps attributable to a belief that since the story board was now to be Government property, it should be an integrated syllabus for the making of a film, comprehensible and usable by its new owner for its intended purpose. This is not to be. To the uninformed examiner, the story board is little more than a collection of photographs, groups of which are bound by rubber bands

holding scraps of paper with cryptic labels, and some of which may seem to have some relationship. There is, however, no hope of integrating all the pictures in the box into a single structural whole. Each one or group of several of the dozens of photographs in fact illustrate an episode in the script or evoke a theme or an emotion contemplated by the film's designer, but the necessary relationships and identifications are not apparent. The difficulty is compounded by the fact that the film for which the story board was created had no continuous or traditional plot; the theme of the film was the conditions of modern American life—its problems and their solution.

The nature of the story board is therefore such that intrinsically it might understandably seem disorderly and fragmentary—a boxful of almost miscellaneous pictures—except on its being expounded by one familiar with its creation. It is primarily a tool for use by its own creator, the film's designer; it does not explain itself to others.

The small remaining criticisms of the story board by the Government only confirm its authenticity as a creative tool and not a set piece. That the same sequence of pictures is not necessarily used in successive expositions, and that not every picture may be used in such successive expositions corroborates that the story board is the personal pictorial notebook of the author for his creative use in making a film, and not a rigorously organized and finished work.

The earlier-recommended judgment is now again recommended. The story board is as the property of the defendant to be delivered to the defendant as a condition of the money judgment for plaintiff. The controversy as to what is the story board has now been resolved. The story board now lodged with the clerk is found to be the authentic and complete story board. Compliance with the condition of the recommended judgment may be accomplished by the delivery by the clerk to the defendant of the

exhibit marked F at the hearing on April 4, 1973, together with plaintiff's exhibit 319 at the original trial, a portion of the story board known as the quanto theme.