**WEBSTER UNIVERSITY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 683–86C.

United States Claims Court.

May 15, 1990.

Margaret McCloskey, Washington, D.C., Atty. of Record for plaintiff.

Ann L. Springer, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

This case is before the court on cross-motions for summary judgment filed by plaintiff Webster University (Webster) and the United States, acting through the Department of the Army (defendant). Resolution of the subject dispute rests upon a determination of whether Webster is entitled to recover contract damages, under one of several theories, allegedly incurred in the attempted establishment of two on-base graduate degree programs at Fort Hood, Texas. Jurisdiction is premised on the Contract Disputes Act, 41 U.S.C. §§ 601 *et seq.* Due to the existence of genuine issues of material fact on the paramount question of whether or not there was an expressed or implied-in-fact contract between the parties, both cross-motions are hereby DENIED.[1]

FACTS

The following material facts are undisputed. In an effort to establish on-base graduate level education programs at Fort Hood, Texas, officials at that installation approached two local in-state universities, American Technological University (ATU) and Texas A & M University (TA & M), to determine their level of interest in providing such services. After learning that neither of the two entities would be able to satisfy the defendant's needs at Fort Hood, Colonel W. C. Chamberlain, the Deputy Post Commander at Fort Hood, sent letters to six out-of-state schools, including Webster University, soliciting their interest in

---

1. Webster also requested oral argument, which, in view of our finding of genuine issues of material fact, is likewise denied.

providing the desired degree programs. On January 10, 1983, Webster replied to the Chamberlain letter. Because Webster manifested the most interest, officials representing Fort Hood and Webster met to further discuss the possibility of instituting graduate level educational programs at the base.

That meeting resulted in a Decision Paper, prepared by Colonel Armstrong on February 17, 1983, requesting approval from the Fort Hood Commanding General for a proposed invitation whereby Webster would institute two Master of Arts programs, one in Management and the other in Business Administration.[2] The Fort Hood Commanding General, Lt. General W. F. Ulmer, Jr., approved the recommendation for a proposed invitation to Webster on March 11, 1983. Thus, by letter dated March 22, 1983, Webster was "invited" to begin conducting classes on June 1, 1983. Webster responded favorably on March 31, 1983, stating that it was "looking forward to the opportunity."

Following these communications, Webster proceeded to prepare for the implementation of the indicated programs at Fort Hood. On April 18, 1983, it advised the Texas Education Agency (TEA) that Fort Hood had invited Webster to provide graduate programs at the base, and requested TEA approval of these programs for the purpose of veterans' educational assistance benefits.[3] On June 6, 1983, Webster provided information required by the TEA for approval of the Fort Hood programs that were slated to begin with the first fall session in 1983. The TEA responded that its approval was contingent upon receipt of a signed Memorandum of Understanding (MOU) between Webster and Fort Hood. Webster consequently submitted a proposed MOU to Fort Hood officials and advised that a signed MOU was required in order to obtain program approval from the TEA.

Thereafter, Dr. Leigh Gerdine, President of Webster University, executed the MOU on June 8, 1983, while Colonel Chamberlain executed the MOU on July 6, 1983. The MOU provided that Webster was to provide graduate level educational programs and receive tuition payments from the enrolled students, while Fort Hood was to provide office and classroom space, counseling, and promotional assistance. Upon submission of the signed MOU to the TEA, Webster was advised by TEA, on July 13, 1983, that approval of the Fort Hood programs would be effective August 8, 1983.

Classes did in fact commence shortly after August 8 of that year. However, problems began to develop in early September. ATU, a local institution, telephoned the TEA complaining that the courses being offered by Webster duplicated those being offered by ATU. The TEA informed ATU that approval had *not* yet been granted for the Webster programs. ATU also expressed its concern over the duplicative and competitive nature of the Webster programs to Lt. General W. F. Ulmer, the Installation Commander at Fort Hood.

As a consequence of the foregoing, on September 20, the TEA advised Webster that in order to finalize its approval, it would need a copy of Headquarters, Department of the Army (HQDA) approval "for Webster, an out-of-state institution, to teach courses at Fort Hood, Texas, in accordance with the requirements of Army Regulation [AR] 621–5, paragraph 8–7, table 8–1."[4] Colonel Chamberlain also re-

---

**2.** This Decision Paper expressly recognized that the programs to be provided by Webster would duplicate classes being offered by ATU, a local college that the defendant had approached and then discarded after learning that its accreditation had been withdrawn.

**3.** The TEA is the official state approving agency (SAA) in the State of Texas. *See* 38 U.S.C. § 1771. Accordingly, the TEA is charged with, among others, the duty to approve educational courses such as those that Webster proposed to

implement at Fort Hood, for eligibility and receipt of veterans' benefits. *See* 38 U.S.C. § 1772.

**4.** The Army apparently failed to follow its own regulatory procedures in its dealings with Webster, an out-of-state school. The effect of such failure is at issue in this case, but, because there are genuine issues of material fact which prevent us from reaching this issue, *see infra*, we draw no conclusions on the impact of these Army actions. However, the disputed require-

ceived a copy of this letter. Webster informed the TEA that, in its view, the request for HQDA approval should have been directed to the appropriate officials at Fort Hood. The TEA did so by letter dated October 4, 1983. On October 19, 1983, the defendant rejected the TEA request, noting that, pursuant to AR 621–5, Fort Hood was required to submit a letter of approval from the Veterans Administration (VA) before HQDA would issue any approvals.[5] VA approval was in turn contingent upon prior approval of the TEA. Consequently, the approval process reached an impasse.

On October 14, 1983, the defendant advised Webster that the MOU would be terminated because Webster had failed "to conform to the criteria and characteristics" for the provisions of on-post educational institutions in accordance with AR 621–5, in that it had not obtained program approval from the TEA for veterans' educational benefits. Webster was thus forced to suspend classes at the conclusion of the fall term. Subsequent efforts to resolve the matter proved fruitless, despite repeated attempts by Webster, as Fort Hood officials failed to obtain a waiver or exception to the requirements of AR 621–5.

Consequently, on June 14, 1985, Webster submitted a "certified claim" to Fort Hood officials who had been involved in the matter. The claim package was returned to Webster without a decision sometime after that date, as Mr. Joseph F. Cavanaugh, the Educational Services Officer at Fort Hood, noted that he was "unable to determine the proper disposition of [Webster's] request." On October 22, 1985, Webster resubmitted its claim, generally addressed to the "Contracting Officer." No final decision was rendered on that claim.

## CONTENTIONS OF THE PARTIES

Webster contends that it is entitled to $57,379.79 in out-of-pocket losses occasioned by an asserted termination for convenience of either an expressed or implied contract for the establishment of graduate level degree programs at Fort Hood. Webster also avers, in the alternative, that the defendant should be equitably estopped from denying the existence of such a contract in the event it is invalidated by the defendant's failure to comply with the provisions of AR 621–5. Webster argues further, again in the alternative, that it is entitled to relief, even if the alleged contract is deemed invalid, under what amounts to either a *quantum meruit* or *quantum valebant* theory of recovery.[6]

---

ments of AR 621–5 are set out here to illustrate the nature of the problem which prevented Webster from establishing its programs at Fort Hood.

AR 621–5, paragraph 8–7, addresses the procurement of educational services from out-of-state institutions, stating that such schools may be contacted only after a determination has been made that the services cannot be obtained from a school within state boundaries. The procedure for making this determination is contained in AR 621–5, paragraph 8–7, table 8–1, which then establishes guidelines for the approval of out-of-state institutions. As a prerequisite, table 8–1 requires the Army to determine that "no in-State institution can provide required courses or programs." If the determination is made, then the Army Educational Services Officer (ESO) is to "request approval from HQDA to allow out-of-State institutions to offer courses or programs."

As part of this request for HQDA approval, the ESO is directed to submit three written verifications: "a. A letter from the State approving authority stating that no in-State institution can provide required courses or programs. b. A letter from the regional accrediting association stating that the desired courses or programs

have the require [sic] daccreditation [sic]. c. A letter from the VA office stating that VA benefits are available for the courses or programs." Compliance with these requirements must be obtained, under AR 621–5, prior to the execution of documents such as the MOU at issue in this case because, as an overriding general rule, "No formal agreement may be made with an out-of-State institution prior to HQDA approval."

5. *See* note 4, *supra.*

6. *Quantum meruit,* meaning "as much as he merited," has been applied to recovery on any implied-in-fact contract for goods or services, while *quantum valebant,* meaning "as much as it was worth," has traditionally been applied to implied contracts involving goods only. *United States v. Amdahl Corp.,* 786 F.2d 387, 393 n. 6 (Fed.Cir.1986), *citing Urban Data Systems, Inc. v. United States,* 699 F.2d 1147, 1154–55 n. 8 (Fed.Cir.1983). Webster has not clarified under which of these two theories it intends to proceed, but suggests that it is entitled to recovery under one or the other.

The defendant, on the other hand, disputes all claims to entitlement by Webster. Additionally, it raises several defenses to the allegation that either an expressed or implied-in-fact contract was formed, including lack of mutual intent to be bound, lack of consideration passing to the government, and lack of authority to contract on behalf of the government. The defendant also contests the applicability of equitable estoppel, arguing that Webster actually *knew* of, but ignored, the requirements of AR 621–5, which spells out the steps for the implementation of on-base educational programs. In response to Webster's third alternative *quantum meruit* or *quantum valebant* claim, the defendant contends that they too are inapposite. This is true, in the defendant's view, because no benefit was conferred on the government, an essential criterion for the proper application of either theory.

## DISCUSSION

Under RUSCC 56(c), a grant of summary judgment is appropriate "if the pleadings ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The rule "mandates the entry of judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). An issue is *genuine* only if, on the entirety of the record, a reasonable jury could resolve a factual matter in favor of the non-movant, *see, e.g., Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987) (emphasis added), while the *materiality* of a fact is determined by reference to applicable legal standards. *Id.*, 833 F.2d at 1567 (emphasis added).

■ Pursuant to these well-established principles, and upon a thorough review of the record, we are compelled to conclude that summary judgment is inappropriate on either party's motion. This is clearly true because there are genuine issues of material fact which preclude a resolution of the penultimate issue in this case—whether or not a contract was formed between the parties, either expressed or implied-in-fact. Neither litigant has been able to prove, nor concomitantly disprove, the existence of a contract by undisputed fact. In particular, the parties have failed to muster the requisite undisputed evidence on the most crucial aspect of contract formation—whether or not the parties possessed a mutual intent to be bound in contract. Moreover, given the facts stipulated by the parties, genuine fact issues remain with respect to nearly every other element necessary for us to make a determination on whether or not there was a contract.

■ A finding of the existence of genuine issues of material fact on the question of contract formation in this case is inescapable. In order to prove the formation (or lack) of a contract, the parties *must* address four basic elements: (1) mutuality of intent, *e.g., Saul Bass & Associates v. United States*, 205 Ct.Cl. 214, 226–27, 505 F.2d 1386, 1393 (1974); (2) offer and acceptance, *e.g., Russell Corp. v. United States*, 210 Ct.Cl. 596, 608–609, 537 F.2d 474, 481–82 (1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977); (3) consideration, *e.g., Brannan v. United States*, 7 Cl.Ct. 399, 405 (1985); and (4) *actual* authority to contract in the agent purporting to act on behalf of the government, *e.g., H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed.Cir.1984).

These elements are the same for *both* expressed and implied-in-fact contracts. *See, e.g., Fincke v. United States*, 230 Ct.Cl. 233, 244, 675 F.2d 289, 295 (1982), *citing Baltimore and Ohio R.R. Co. v. United States*, 261 U.S. 592, 43 S.Ct. 425, 67 L.Ed. 816 (1923). Most importantly, the critical need to demonstrate mutuality of intent, and in turn lack of ambiguity, in offer and acceptance is the same for both; it is only the nature of the evidence that differs. *Russell*, 210 Ct.Cl. at 609, 537 F.2d at 482. An expressed contract must be manifested by words, either oral or written, which contains agreement and/or mutual assent. *E.g., People's Bank & Trust Co. v. United States*, 11 Cl.Ct. 554, 566

(1987); *Gratkowski v. United States*, 6 Cl.Ct. 458, 461 (1984). An expressed contract "speaks for itself and leaves no room for implications." *Algonac Manufacturing Co. v. United States*, 192 Ct.Cl. 649, 674, 428 F.2d 1241, 1255 (1970) (citations omitted). An implied-in-fact contract, on the other hand "is one inferred from the circumstances or acts of the parties." *Algonac*, 192 Ct.Cl. at 674, 428 F.2d at 1255 (citation omitted).[7]

■ Webster contends, under these principles, that given the totality of the circumstances, there was either an expressed or implied-in-fact contract. In support of its expressed contract theory, Webster relies first on the MOU as a written expression of the definitive contractual obligations undertaken by each party. The MOU was executed pursuant to AR 621–5, entitled "Army Continuing Education System" (ACES), which was promulgated "to fulfill the Army['s] responsibility of developing and conserving its human resources by providing on-duty, job-related educational programs and off-duty educational opportunities for professional and personal development." AR 621–5, paragraph 1–6(b). Chapter 8 of AR 621–5, entitled "Contracting for Educational Services," concerns itself with Army procedures for the procurement of on-base educational services by private organizations and institutions. Paragraph 8–2(a)(3) makes express provision for the acquisition of such services through the use of MOUs.

In that context, paragraph 8–2(a)(3) describes the nature and effect of a MOU in the following manner:

> [MOUs are] [w]ritten agreements between the installation commander and accredited educational institutions which clearly identify the responsibilities and obligations of each in providing on-post educational services. *MOUs are not contracts and therefore are not in themselves binding on either party.*

(emphasis added).

Thus, if the MOU constituted the sole basis for Webster's contract argument, it is clear that the MOU, *ipso facto*, could not, and did not, create an expressed contract between the parties. The unambiguous language of the regulations precludes a finding that the defendant *intended* to be bound in contract at the time the MOU was executed. Thus, we cannot conclude as a matter of law that the MOU was an unequivocal manifestation of mutual assent or agreement. This being true, we hold that no expressed contract was formed by the parties' mere execution of the MOU.

Webster, however, in addition to asserting the MOU as a basis for recovery, nevertheless contends that *other* writings between the parties, including their conduct, demonstrate each of the requisite elements necessary to establish the formation of either an expressed or implied-in-fact contract. According to Webster, a contract is evinced by: (1) the defendant's March 22, 1983 letter or "offer," whereby Fort Hood officials, allegedly authorized to bind the government in contract, "invited" Webster to begin conducting classes at Fort Hood in the areas of business administration and management; (2) Webster's purported "acceptance" of the "offer" by letter on March 31, 1983, wherein Webster stated that "We appreciate the opportunity you are giving us to provide our graduate programs ... for the military personnel at Fort Hood. We look forward to working with you and your staff"; (3) mutual consideration in that Webster agreed to provide educational services for the benefit of base personnel in return for the use of those on-base facilities that would be needed for that purpose; and (4) the institution of Webster's programs at Fort Hood on August 8, 1983.

---

7. The Court of Appeals for the Federal Circuit has outlined the requirements for an implied-in-fact contract most succinctly in *Prudential Insurance Co. of America v. United States*, 801 F.2d 1295, 1297 (Fed.Cir.1986):

> A contract implied in fact is not created or evidenced by explicit agreement of the parties, but is inferred as a matter of reason or justice from the acts or conduct of the parties. However, all of the elements of an express contract must be shown by the facts or circumstances surrounding the transaction—mutuality of intent, offer and acceptance, authority to contract—so that it is reasonable, or even necessary, for the court to assume that the parties intended to be bound.

The defendant, predictably, contests the existence of any contract based on the writings or conduct of the parties under either an expressed or implied-in-fact contract theory. In that connection, the defendant vigorously contends—that the Fort Hood officials were without actual authority to bind the government in contract, that there was no offer or acceptance, and that there was no consideration to the government. While all three of these allegations raise genuine issues of material fact in and of themselves, we think the prime thrust of the defendant's position is a purported lack of any mutual intent to be bound in contract.

The Army repeatedly avers that it never intended to execute or enter into a binding contract. To support this argument, it points to the alleged non-binding effect of the MOU itself under AR 621–5, paragraph 8–2(a)(3). Outside of the limited effect of the MOU, the defendant cites the ambiguous "invitation" and "acceptance" language contained in its letter of March 22, 1983, and the March 31, 1983 response from Webster. The Army contends that its "invitation," in addition to its subsequent conduct, demonstrates only that it wished to establish educational programs at Fort Hood through the use of a MOU, which was never viewed as a binding contract. Thus, the defendant states that its "conduct throughout this period of time does not reflect a desire on the part of the Government to enter into a binding contract with Webster."

Against this background, we are, therefore, presented with a situation in which the parties attach different meanings to the letters and conduct of the Fort Hood officials responsible for establishing educational opportunities on base—Webster arguing in favor of finding those elements necessary for contract formation and the Army alleging lack of mutual intent. By doing so, the mutual intent of the parties, an essential element in every determination of contract formation, has been placed squarely in issue. *See, e.g., Saul Bass*, 205 Ct.Cl. at 226–27, 505 F.2d at 1393 ("The intent of the parties, as always in the law of contracts, is determinative, the question being whether the parties intended not to be bound or whether either of them manifested an intent to the other not to be bound until a fully integrated contract had been executed.") (citations omitted). Subjective or mutual intent is, however, a question of fact that must be determined from all probative circumstances.

Because intent is a question of fact and not a question of law, the resolution of a dispute by summary judgment is inappropriate where, as here, there is a question as to whether there was a mutual intent to contract. As one noted authority has stated: "Summary judgment [cannot] be granted if issues are presented involving any inquiry into the state of mind of any of the contracting parties." C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* 2d § 2730.1 at 265 (1983); *see FMC Corp. v. Manitowoc Co., Inc.*, 835 F.2d 1411, 1416 (Fed.Cir.1987) ("intent is a question of fact"), *citing KangaROOS U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1573, 228 USPQ 32, 33 (Fed.Cir.1985); *accord* A. Corbin, *Corbin on Contracts* § 554 (1960) ("The question of interpretation of language and conduct [in contract interpretation] ... is a question of fact, not a question of law."), *quoted in Beta Systems, Inc. v. United States*, 838 F.2d 1179, 1183 (Fed.Cir.1988).

Thus, on the record before us, we cannot determine, as a matter of law, that the parties possessed the necessary mutuality of intent to contract. This being true, summary judgment cannot be granted under RUSCC 56(c). Furthermore, because we are unable to resolve the threshold issue in this case, that issue being whether or not there was a contract, any attempt to analyze either of Webster's alternative theories for entitlement to relief would be premature. Resort to those theories is appropriate, in our view, *only* after deciding the status of the alleged contract. We, therefore, decline to address Webster's claim for recovery under the principles of equitable estoppel, *quantum meruit*, or *quantum valebant*.

CONCLUSION

The parties' cross-motions for summary judgment are hereby DENIED, as there are genuine issues of fact to be determined by this court. The matter shall be set for trial on all issues following appropriate discovery, Appendix G filings, and a pretrial conference. The pretrial schedule is as follows:

1. Discovery shall be completed by both parties on or before July 16, 1990;

2. The meeting of counsel called for by paragraph 10 of Section V of Appendix G shall be held by August 1, 1990;

3. The memoranda called for by paragraphs 11–17 of Section V of Appendix G shall be filed by August 24, 1990;

4. The pretrial conference shall be held at 10:00 a.m., Friday, August 31, 1990, at the National Courts Building, 717 Madison Place, N.W., Washington, D.C. 20005. The exact courtroom location will be posted in the lobby at that time.

IT IS SO ORDERED.