GOLDBERGER FOODS, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 73–88C.

United States Claims Court.

June 5, 1991.

Frank R. Berman, Minneapolis, Minn., attorney of record, for plaintiff.

William K. Olivier, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

### REGINALD W. GIBSON, Judge:

This contract case is before the court for decision following a trial on the merits. Plaintiff, Goldberger Foods, Inc. (GFI), is seeking relief for an allegedly mistaken bid that it submitted in response to a United States Department of Agriculture (USDA or defendant) solicitation for the purchase of frozen 100% beef patties (all-beef patties) and patties with vegetable protein product added (soy patties). According to GFI, it inadvertently failed to mark up its all-beef bids by $.11 per pound, a margin that was intended to cover manufacturing costs, overhead and profit. Plaintiff contends that this omission was reported to the contracting officer (CO) prior to contract award; that it should have been allowed to correct or withdraw the bid because it demonstrated both the mistake and the bid actually intended by clear and convincing evidence; and that it was injured when the CO subsequently assessed $122,-698.65 in reprocurement costs and liquidated damages for nonperformance. In rebuttal, the defendant argues that the alleged omission, if indeed there was one, was a noncompensable error in judgment by GFI. Moreover, it adamantly asserts that the time of contract award is not of critical importance here because GFI has *never* established the existence of the alleged mistake by any quantum of proof.

For the following reasons, we find that GFI informed the CO of its alleged $.11 per pound mistake before the bid was accepted. However, the CO awarded the contract without analyzing the GFI claim, as she was required to do, under those regulations governing mistakes alleged before award, *see* 48 C.F.R 14.406–3 (1987).[1] In any event, this was harmless error because GFI failed to prove its meat costs by even reasonable evidence. In other words, GFI failed to establish that it actually omitted its alleged $.11 per pound margin mark up for overhead, profit, and manufacturing costs. Indeed, the evidence warrants an inference that GFI did in fact include substantial mark up in its all-beef bids, and thus, we find that its intentional decision not to mark them up by the full $.11 per pound, if that occurred, was a noncompensable error in judgment. Given the foregoing, we find in favor of the defendant.

## FACTS

### A. *The Solicitation*

In June of 1986, the USDA Agricultural Marketing Service (AMS), Commodity Procurement Branch, Livestock and Seed Division, issued Announcement LS–53, stating that subsequent "Invitations"[2] would be issued calling for bids to furnish all-beef and soy patties for distribution in federal child nutrition programs. PX 2, ¶ IA; JX 1, ¶ 1, 2. LS–53 set out the general contract provisions, and explained that specific terms concerning offer dates, bid closing dates, and shipping destinations would be governed by each succeeding solicitation. Subsequently, on January 6, 1987, the USDA issued Invitation # 14, the specific solicitation in dispute here. PX 6. It requested offers for 30 units of all-beef and 40 units of soy patties, a total of 70 units equalling approximately 2,772,000 pounds. PX 6; JX 1, ¶ 4. Invitation # 14 listed 41

---

**1.** The text of this and other relevant FAR regulations are set out *infra*.

**2.** Announcement LS–53 incorporated by reference USDA–1, the "General Terms and Conditions For the Procurement of Agricultural Commodities and Services." PX 1. USDA–1, Art. 2, ¶ (f) defines an "announcement" as "an instru-

ment which states terms and conditions for the procurement of a designated commodity or service. It may in itself invite offers for the commodity or service ... [or, as here] it may provide for the issuance of a separate notice requesting bids and may set forth other special terms...."

different shipping destinations, and instructed bidders to submit their offers "by mail, telegram, mailgram, TWX, telecopier, telex, or [by hand]" no later than Friday, January 16, 1987, at 3:30 p.m. in Washington, D.C. PX 2, ¶ II, A. It further advised that contracts would be awarded no later than midnight on Friday, January 23, 1987, and that delivery was to be made between the 22nd and 28th of February, 1987. PX 6.

## B. *The GFI Bid*

GFI is a meat processing company located in Minneapolis, Minnesota, and it was a regular bidder on LS–53 solicitations. All of its bids, including those eventually submitted in response to Invitation # 14, were formulated entirely by the company controller, Mr. William Prescott, and that process is of critical importance to this dispute. The Invitation # 14 solicitation was received by Mr. Prescott on January 6, 1987, and he reviewed its requirements with Mr. Robert Goldberger, the president of GFI. They eventually decided to submit a bid, and to accept an award for no more than 25 units.[3] Having determined the amount of raw beef that would be needed if GFI were successful in obtaining all 25 units, Mr. Goldberger then telephoned his suppliers to obtain oral pricing commitments for the raw beef that would be necessary to manufacture the required number of patties. Tr. p. 491, 493.

In doing so, Mr. Goldberger testified that he did not ask for, and did not receive, any written quotes from his suppliers because written communication is the exception rather than the rule in the meat industry. Tr. p. 493. However, the evidence shows that certain records are produced when

GFI obtains an award and actually purchases raw beef to fulfill its contractual obligations, and those records are maintained in a "disbursement file" that includes purchase orders, canceled checks, bills of lading, invoices, and other documentation. Tr. p. 678. GFI did purchase raw beef to fulfill a portion of its obligations under Invitation # 14,[4] but none of those records were presented at any time in this case, including the trial.

Nevertheless, Mr. Goldberger used the raw beef prices quoted by his suppliers as the basis for developing the raw beef prices that GFI used in calculating its all-beef and soy meat costs on Invitation # 14. In this respect, the record shows that the raw beef costs actually employed by GFI were subject to the sole discretion of Mr. Goldberger, who had the option of using raw beef prices that were higher than the prices actually quoted to him. *See* Tr. pp. 312, 495–497. Moreover, the record also shows that the raw beef prices charged by GFI in calculating its all-beef and soy meat costs were usually higher than the prevailing raw beef market prices for that day. PX 13; DX 107. In any event, GFI was required to purchase two different grades of raw beef to manufacture the all-beef and soy patties under LS–53. Each product is created by combining 90% and 50% lean trimmings[5] in a set ratio to produce a patty with the desired percentage of lean meat. *See* Appendix A, Meat Cost Calculations. In the case of Invitation # 14, Mr. Goldberger obtained quotations for 90% and 50% lean trimmings from at least two different suppliers. *See* Tr. pp. 492–493.

The prices that he developed based on those quotes were passed along to Mr. Prescott, who was responsible for comput-

---

3. Under LS–53, bidders were permitted to bid on every destination listed on the solicitation in order to maximize the possibility of an award, while simultaneously limiting the number of units for which they would accept an award to an amount less than the total number of units bid. PX 2, ¶ C, 4. On Invitation # 14, GFI bid on all 70 units of beef listed on the solicitation, but limited the number of units for which it would accept an award to 25 units. In doing so, it did not express any preference for one product or the other.

4. After it alleged a mistake in its bid, GFI refused to perform most of the contract. However, the evidence shows that it did perform one part of the disputed contract awarded under Invitation # 14, *see infra.*

5. 90% lean trimmings are a higher grade, more expensive beef product than 50% lean trimmings.

ing the per pound meat costs for the all-beef and soy products. He penciled in the raw meat prices he received from Mr. Goldberger on the first page of the Invitation # 14 offer sheet, and then, based on an algebraic formula that he committed to memory because of its repeated use, he computed the soy and all-beef meat costs on his calculator. Tr. p. 371. The prices quoted by Mr. Goldberger and the resulting meat costs calculated by Mr. Prescott for use in the GFI bids were as follows:

| (Provided By Robert Goldberger) | | (Calculated By William Prescott) | |
|---|---|---|---|
| 90's/50's | Loads | Soy Costs | All-Beef Costs |
| $1.13/.51 | 5 | $.7400 | $.9750 |
| $1.15/.51 | 20 | $.7500 | $.9900 |

These figures were recorded on the front page of the Invitation # 14 bid announcement. Tr. p. 332; PX 13 p. 1. Next, Mr. Prescott went through each of the listed shipping destinations, adding freight costs as appropriate. *See* PX 67. Finally, he was supposed to add an $.11 per pound "mark up"[6] to the meat and freight costs for each destination. This $.11 per pound figure included $.0250 for packaging, $.0225 for labor, $.0200 for freezing, $.0075 for grading, and $.0350 for fixed overhead and profit. Tr. pp. 501–503, 102–106; PX 66. GFI conceded that it added this $.11 margin to each of the soy bids, but alleges that said amount was omitted from the Invitation # 14 all-beef bids.

Thus, the final bid calculation consisted of three elements—meat costs, freight costs, and the predetermined mark up for manufacturing costs, overhead, and profit. This end result, or "delivered price," was recorded alongside each destination on the Invitation # 14 offer sheet and submitted to the USDA. Tr. p. 333. Significantly, Mr. Prescott alleges that, as a matter of practice, he did not maintain any work papers or any contemporaneous record of his mathematical calculations for Invitation # 14 other than those figures that he re-corded on the face of the offer sheet. Tr. pp. 332–333, 335–336; PX 13, pp. 16–17. Moreover, again as a matter of practice, Mr. Prescott stated that he did not review his work for errors, nor did any GFI employee examine his mathematical calculations on Invitation # 14 for mistakes.[7] Tr. pp. 332, 498.

C. *Bid Submission, Opening, and Analysis*

GFI sent its bid to the USDA by Western Union "Easy Link" on Friday, January 16, 1987. PX 7; JX 1, ¶ 6. The bid was timely and was one of nine offers received by the defendant under Invitation # 14. PX 40. Although the GFI offer was limited to 25 units, its bids were competitive on all 70 units of product solicited by the USDA. JX 1, ¶ 8; PX 7. At 3:30 p.m. on January 16, 1987, the bids were opened and processed by Contract Specialists in the Livestock and Seed Division, Commodity Procurement Branch of AMS, who reviewed each of them for completeness and for any obvious errors requiring the attention of the Contracting Officer. Tr. pp. 904–905. No obvious errors were reported for any bid on Invitation # 14, and consequently, the information on each was entered into a

6. The amount of mark up varied, depending on GFI's desire to win a contract, but was allegedly never less than $.11 per pound.

7. Apparently, Robert Goldberger usually examined the bids prepared by Mr. Prescott on previous solicitations before they were sent to the USDA, but this examination was cursory and never involved a mathematical analysis. The bid on Invitation # 14, however, did not receive even this minimal level of scrutiny because Robert Goldberger was in Florida at the time of bid submission.

computer system for analysis. Tr. pp. 573–574, 578–582, 623–624.

The computer produced a "bid array," combining the prices bid by each vendor for each destination in one document for ease of comparison, and also conducted a "bid analysis" to search for the lowest possible cost solution based on the bids received, the quantity of desired product, and shipping destination. *See* PX 41; DX 140, p. 4. The results of this analysis were recorded on a "bid analysis worksheet," showing the range of prices bid, the range of prices paid, the average price paid, and a comparison of the low, high, and weighted averages against the USDA's measure of raw material cost. PX 43. After three runs through the bid analysis program, the computer determined that GFI should receive an award for 24 units (950,000 pounds) of all-beef and one soy unit (39,600 pounds) of soy patties. *See* PX 40. The CO, Ms. Barbara Cope, reviewed these analyses and the award information generated by the computer, compared the prices bid with prices paid by the USDA under previous invitations, compared the prices bid against market conditions and against raw material costs, and determined that the prices bid by GFI and three other offerors were within the prior purchasing experience of the USDA. DX 106.

### D. *Award*

Therefore, on Wednesday, January 21, 1987, the CO proceeded to award the Invitation # 14 contracts. First of all, she prepared a document known as the "Food Purchase Report," which detailed all of the commodity purchases under Invitation # 14. DX 112. Next, Ms. Cope drafted separate contracts for each of the four successful bidders, including GFI. Tr. p. 761. She signed two copies of each individual contract, one for telegraphic transmission and a signed copy for mailing (telegraphic copies did not contain the CO's signature). Tr. p. 763. Around 2:00 p.m. on January 21, 1987, she delivered a copy of the Food Purchase Report to the USDA Press Service with instructions to post that document in the USDA lobby in Washington, D.C., at 2:30 p.m. Tr. p. 762. At 2:14

p.m., a package containing a copy of the Food Purchase Report and each individual contract was delivered to the AMS Leased Wire Unit, PX 18, which was directed to begin distributing that information electronically no earlier than 2:30 p.m. This simultaneous release of all commodity award information through these public channels was a customary USDA practice, designed to give the general public and successful bidders concurrent notice of USDA procurements and to minimize the impact of USDA purchases on the daily commodity markets. The USDA viewed 2:30 p.m. EST as the time of contract award, and permitted USDA employees to orally disclose contract award information to any interested party after that time. DX 130.

GFI became aware of this policy, and thus, Mr. Prescott usually called the USDA directly around 2:30 p.m. on the Wednesday following the deadline for bid submissions because that was the day the USDA normally released LS–53 award information. He followed this procedure in the case of Invitation # 14, and telephoned the USDA just before 2:30 p.m. on Wednesday, January 21, 1987, anticipating an announcement of the bidding results. The USDA was not required to announce these results until midnight on Friday, January 23, 1987, but Ms. Marlene Hines, a Contract Specialist for LS–53 procurements, spoke with Mr. Prescott and explained that the Invitation # 14 award information would indeed be released that afternoon at 2:30 p.m. Consequently, Mr. Prescott stayed on the line, and shortly after 2:30 p.m., Ms. Hines stated that GFI was the low bidder on 24 units (950,000 pounds) of all-beef and one unit (39,600 pounds) of soy product. JX 1, ¶s 7, 11. Ms. Prescott immediately stated "Uh oh, I goofed," and simultaneously checked his file copy of the Invitation # 14 offer sheet. PX 17; Tr. p. 597. He then informed Ms. Hines that his all-beef bids included only his meat and freight costs, and that he inadvertently failed to add in an $.11 per pound margin for manufacturing costs, profit, and overhead. JX 1, ¶ 12; PX 17; Tr. p. 124.

The conversation ended after Ms. Hines told Mr. Prescott that he would have to pursue the matter with the CO, Ms. Cope. Mr. Prescott then informed Robert Goldberger of the mistake, who called Ms. Cope sometime around 3:00 p.m. that day. Tr. pp. 507, 772. Ms. Cope advised Mr. Goldberger to submit written evidence of the alleged mistake, including work sheets, supplier quotes, and any other supporting documentation. Tr. pp. 773, 508. One-half hour later, at approximately 3:38 p.m., the AMS Leased Wire Unit commenced sending the unsigned telegraphic notice of award to GFI. PX 15. Contract No. 7–3195, which was signed by the CO, was mailed that same day, and received by GFI approximately one week later. PX 14.

The next day, on January 22, 1987, GFI assembled and submitted some of the materials requested by Ms. Cope. In his transmittal letter to the CO, Mr. Goldberger stated that "Goldberger Foods made a mistake in calculating the price on the All Beef Patties. We left out of the bid price all of our manufacturing costs and margins above meat cost." PX 11. This letter was accompanied by several spreadsheet schedules for Invitation #'s 11 through 14, and the GFI file copy of the offer sheets for each of those invitations. Each of those four offer sheets contained penciled-in markings, similar in nature to those described above, for the 90% and 50% lean trimming prices supplied by Mr. Goldberger, and the resulting all-beef and soy meat cost calculations by Mr. Prescott. PX 13. The four schedules attached to each of these offer sheets purported to demonstrate—how GFI utilized the raw beef prices to calculate the soy and all-beef meat costs, and also how those meat costs were then used to compute bids. They were also designed to show that the all-beef bids as alleged on Invitation # 14 failed to encompass the $.11 per pound mark up for manufacturing costs, overhead, and profit that was allegedly included in all of its bids on the three previous solicitations and the soy bids on Invitation # 14. These spreadsheets were created by Mr. Prescott on January 22, 1987, the day after the mistake was alleged. In this regard, he stated that

"[t]he only worksheet that I make up when doing the bid pricing is the posting of prices on the bid announcement itself." PX 13, p. 1. Therefore, GFI did not submit any supplier quotations, nor did it submit any other documentation probative or corroborative of the alleged omitted $.11 per pound mark up.

The CO reviewed this evidence, along with the material in the USDA files, and, on February 2, 1987, rejected the GFI request for relief. She determined, first, that the mistake was alleged after contract award, and secondly, that the evidence did not rise to the level necessary to support a contract reformation or rescission. PX 12; JX 1, ¶ 15. Subsequently, GFI completed that part of the contract calling for the manufacture of one soy patty unit by the February 28, 1987 deadline for delivery under Invitation # 14, but refused to perform the contractual provision on the 24 all-beef units. JX 1, ¶ 16. As a consequence, on March 4, 1987, the CO issued a 10–day cure notice. JX 1, ¶ 17; PX 27. GFI persisted in its refusal to manufacture and deliver the 24 units of all beef at the prices bid; as a result, that portion of the contract was terminated for default on March 26, 1987. JX 1, ¶ 18; DX 139. Ms. Cope thereafter initiated reprocurement procedures for the 24 units of all-beef patties by issuing a new invitation on March 27, 1987. GFI participated in this reprocurement, and, on April 1, 1987, received an award for seven of the 24 units reprocured. JX 1, ¶ 19; PX 24; PX 26. As a result thereof, by letter dated June 2, 1987, the CO assessed $79,930.65 in reprocurement costs and $42,768.00 in liquidated damages against GFI, a total of $122,698.65. JX 1, ¶ 20; PX 24. The USDA issued a demand for payment of the above amount on June 15, 1987, DX 135, and again on July 28, 1987. JX 1, ¶s 21, 22; DX 136. GFI refused to pay, and on August 28, 1987, the USDA offset $124,027.89 due GFI under a subsequent contract. JX 1, ¶s 23, 24. The subject complaint was filed in this court on February 2, 1988.

## ISSUES

Stated in the simplest possible terms, GFI contends that it made an $.11 per

pound unilateral mistake of omission on the Invitation # 14 all-beef bids; that it reported this mistake to the CO before the contract was awarded; that the CO proceeded to award the contract despite clear and convincing evidence of the mistake and the bid actually intended; and consequently, that a binding contract never came into existence. The defendant, on the other hand, adamantly argues that the alleged omission is an error in judgment and is not a compensable mistake; and that GFI has failed to adduce sufficient probative evidence of either the purported error or the bid actually intended. Thus, it contends that the contract award was valid on the basis of the bid submitted.

By putting the various contentions in logical order, we think that the issues in this case are best stated in the following manner:

1) Has GFI established that it is entitled to recover?
 a) Did GFI allege the mistake to the CO before or after the contract was awarded?
 b) Depending on the timing of the award, did GFI prove the existence of a mistake by the requisite quantum of proof under the appropriate regulations?
2) Was the alleged unilateral omission of $.11 per pound the result of a clear cut arithmetical or clerical mistake, or was it the result of a noncompensable error in judgment?

For the following reasons, we find that GFI raised the possibility of mistake before the contract was awarded, and that the CO should have applied the provisions outlined in FAR 14.406–3 for mistakes alleged *before* award. The CO did not do so because she incorrectly determined that the contract had been awarded before she was advised of the mistake, and as a consequence, she analyzed the merits of the claim under the wrong regulations. Her application of FAR 14.406–4, which governs mistakes alleged after award, was erroneous, but we find that this failure was harmless because GFI failed to adduce sufficient creditable evidence to warrant a bid

correction pursuant to FAR 14.406–3(a) or a bid withdrawal under FAR 14.406–3(c). Finally, the evidence warrants an inference that GFI did mark up its all-beef bids, and that it intentionally manipulated the amount of that mark up. Thus, if GFI did in fact fail to mark up its bids by the full $.11 per pound, that alleged error was one of judgment, and is not compensable in any event. We will examine each of these issues *seriatim*.

DISCUSSION

A. *Has GFI Established That It Is Entitled To Relief?*

The broad issue in this case is—whether GFI has demonstrated by the requisite quantum of proof that it should have been allowed to correct or withdraw its bid, or in the alternative, to reform or rescind the contract on the basis of its alleged mistaken all-beef bids. Mistakes in bidding are governed by FAR 14.406, which contains different guidelines for weighing the merits of a claim. Mistakes alleged before award are covered by FAR 14.406–3, while those raised after award are controlled by FAR 14.406–4. Here the parties agree that GFI alleged a mistake between 2:30 and 2:35 p.m. on January 21, 1987, and that the USDA accepted the GFI bid as submitted sometime on that same day. They vigorously disagree, however, as to the exact time of the award, and thus, hotly dispute which of the two regulatory alternatives apply to this case. Thus, before we can apply the suitable regulations and analyze the GFI claim properly, we must decide whether the contract was awarded before or after the mistake was alleged to the CO.

We find, as explained below, that the USDA did not accept the GFI bids on Invitation # 14 until it sent a written notice of award via telegram at 3:38 p.m., more than an hour *after* GFI telephonically alleged that a mistake had been committed. The CO's decision to the contrary was incorrect, and her application of FAR 14.406–4 was clearly erroneous because she should have delayed contract award pending analysis of the GFI claim under FAR 14.406–3. However, we nevertheless find that this omis-

sion by the CO was, in effect, harmless error because GFI did not, and has not, adduced even reasonable evidence establishing the existence of a mistake.

### 1. Did GFI Allege The Mistake Before Or After Contract Award?

We must first determine—whether the contract was awarded before or after GFI alleged a mistake in its bid between 2:30 and 2:35 p.m. on the afternoon of January 21, 1987. On the one hand, the defendant contends that the contract was awarded on January 21st at 2:30 p.m. when the USDA Press Service and the AMS Leased Wire Unit were authorized to release all of the Invitation # 14 award information to the public, or in the alternative, when Mr. Prescott received actual notice from Marlene Hines minutes or seconds before he raised the possibility of an error. On the other hand, GFI asserts that the contract was not awarded at the earliest until the AMS Leased Wire Unit commenced its transmission of the telegraphic notice of award at 3:38 p.m. Based on the express contract language at issue here, and on the relevant regulations, we agree with GFI.

The timing of the award is addressed by LS–53 ¶ III, reducing this controversy to nothing more than a matter of contract interpretation. In this respect, LS–53 ¶ III states, in part, that:

*Acceptance of offers* [under Invitation # 14] *will be made by prepaid telegram, telecopy, TWX, or telex* [by January 23, 1987].... *The date of acceptance by USDA shall be the contract date. A written award or acceptance of a bid mailed or otherwise furnished to successful bidders within the time for acceptance specified [in each invitation]*

*shall result in a binding contract without further action by either party.*
PX 2 (emphasis added).

The requirements outlined in this contract provision mirror the FAR in all material respects, *see* 48 C.F.R. 14.407–1. For example, under FAR 14.407–1(a)(1) and (2),[8] the CO must, in all cases, issue a *written* notice of acceptance within the time specified in the solicitation in order to create a valid contract. An award may be made by using a formal signed document, *see* FAR 14.407–1(c)(1), or by using an informal unsigned notice of award, *see* FAR 14.407–1(c)(2) and 14.407–1(d)(2). If an informal unsigned notice of award is employed, it will create a binding contract under FAR 14.407–1(c)(2) so long as it is followed by a formal award document as soon as possible. In all cases, the award document must be properly furnished to the successful bidder under FAR 14.407–1(c)(1).[9] Thus, unsigned telegrams and other informal methods of written communication may be used to convey a notice of award, FAR 14.407–1(d)(2), and will create valid binding contracts when they are cemented with subsequent formal award documents.

Therefore, in order to create a binding contract under either LS–53 ¶ III and FAR 14.407–1, the USDA was clearly obligated to furnish a written notice of award, within the time specified for acceptance, directly to those bidders with the responsive bids that were most advantageous to the government. Additionally, inasmuch as informal telegraphic notices were in fact used, USDA was obligated to follow up such electronic communications with formal contract documents as soon as possible. We think it is obvious that *only* the 3:38 p.m. telegram satisfied these requirements. It necessarily follows, and we hold, that a binding contract was not created by

8. FAR 14.407–1(a) states, in part, that:

The contracting officer shall make a contract award (1) *by written notice,* (2) within the time for acceptance specified in the bid ..., and (3) to that responsible bidder whose bid ... will be most advantageous to the Government, considering only price and the price-related factors ... included in the invitation.... (emphasis added).

9. FAR 14.407–1(c) provides that:

(1) Award shall be made by mailing or otherwise furnishing a properly executed award document *to the successful bidder.*
(2) When a notice of award is issued, [it must also be mailed or otherwise furnished to the successful bidder, and then] it shall be followed as soon as possible by the formal award.

the 2:30 p.m. public release of Invitation # 14 award information via the Food Purchase Report, nor did the USDA make a binding acceptance at 2:35 p.m. by providing GFI with telephonic notice that it was the low bidder on 24 all-beef units.

#### a. *The 3:38 p.m. Telegram*

■ The telegram fulfilled each and every one of the contractual and regulatory requirements for the creation of a binding contract. It was an acceptable way of providing an informal notice of award, *see* LS–53 ¶ III, FAR 14.407–1(d)(2); it was written, *see* LS–53 ¶ III, FAR 14.407–1(a)(1) and furnished within the time specified for acceptance under Invitation # 14, *see* LS–53 ¶ III, FAR 14.407–1(a)(2); it was sent *directly* to GFI, *see* LS–53 ¶ III, FAR 14.-407–1(c)(1); and it was followed immediately by a properly executed formal award document, *see* FAR 14.407–1(c)(2). Therefore, we find that the contract was awarded no earlier than, if not *at*, 3:38 p.m. on January 21, 1987.

#### b. *The Public Release of Award Information*

■ Using the same analysis, it is clear that the Food Purchase Report was not enough to, *ipso facto*, create a binding contract, either under the terms of LS–53 ¶ Ill or under FAR 14.407–1. This is true for no less than three reasons. First of all, both the contract and the regulations unequivocally obligated the defendant to furnish written notice, either formal or informal, *directly* to each of the successful bidders in order to create a binding contract. In this context, LS–53 ¶ III specifically explains that a binding contract will be created without further action by either party only when a "written [notice of] award or acceptance" is "mailed or otherwise furnished *to the successful bidder[]...."* Similarly, FAR 14.407–1 states that a contract can be made only by mailing or otherwise furnishing a "written notice" of

award, FAR 14.407–1(a)(1), *"to the successful bidder."* FAR 14.407–1(c). Therefore, we find that the public release of award information via the Food Purchase Report to the general public at large simply did not provide GFI with the type of *direct* written notice contemplated under the explicit language of the contract, nor did it comply with the germane regulatory provisions.

Secondly, while LS–53 ¶ III and FAR 14.-407–1 both allowed the parties to employ various methods of informal communication, they did not and do not, in our view, envision the use of public postings and press releases as a means of conveying acceptance. In this respect, it is well established that "[t]he intent of the parties, as always in the law of contracts, is determinative...." *Saul Bass & Associates v. United States*, 205 Ct.Cl. 214, 226–227, 505 F.2d 1386, 1393 (1974) (citations omitted), and accordingly, we must presume that such intent is adequately expressed in the language of the contract. *See generally, Algonac Manufacturing Co. v. United States*, 192 Ct.Cl. 649, 674, 428 F.2d 1241, 1255 (1970) (an express contract "speaks for itself and leaves no place for implications.") (citations omitted). This is particularly true when the contract speaks directly to the subject in question. In this connection, we observe that LS–53 ¶ III does not contain any indication that *either* the USDA or GFI intended to be bound by the public release of award information via the Food Purchase Report. The defendant's assertions to the contrary are self-serving, and at variance with the explicit language of the contract and the governing regulations. If the USDA truly intended to use such a device to effectuate contract awards, it could have, and should have, apprised potential bidders of that desire by drafting LS–53 ¶ III with that goal in mind. As it stands, we find that LS–53 ¶ III does not provide for acceptance in this manner.[10]

---

10. Even if LS–53 ¶ III could be viewed as ambiguous enough to embrace the interpretation adopted by the defendant, that would not alter the outcome. Under the doctrine of *contra proferentum,* we would be forced to construe that drafting failure against the USDA. *See, e.g.,*

*Fort Vancouver Plywood Co. v. United States,* 860 F.2d 409, 414 (Fed.Cir.1988) ("[u]nder the rule of *contra proferentum,* the contract is construed against its drafter if the interpretation advanced by the nondrafter is reasonable."), *citing United States v. Turner Construction Co.,* 819

Thirdly, even if we were to agree that the defendant could bind bidders by releasing the Food Purchase Report to the public, the defendant simply failed to prove that it was actually disseminated at precisely 2:30 p.m., or, by the same token, that it was available to GFI before it alleged the mistake at 2:35 p.m. There is no evidence at all establishing that the Food Purchase Report was actually posted in the USDA lobby at 2:30 p.m. on January 21, 1987. Thus, the record does not support a finding that the Food Purchase Report was released by the AMS Leased Wire Unit at 2:30 p.m. To the contrary, the evidence indicates that the AMS Leased Wire Unit did not actually send the Food Purchase Report to the Market News Services until approximately 3:13 p.m. on January 21, 1987, DX 137; Tr. p. 552, more than 30 minutes after GFI asserted the existence of a mistake in its bid. Thus, even if we were to accept this flawed theory, which we emphatically do not, we find that the conclusion drawn by the defendant is not supported by the evidence.

c. *The Telephonic Notice of Award*

■ Finally, it is also apparent that a valid contract was not created at 2:35 p.m. when GFI was telephonically informed that it was a successful bidder under Invitation #14. LS–53 ¶ III and FAR 14.407–1(a)(1) both unequivocally require a *written* notice of award, and the actual notice conveyed to GFI in the telephone conversation between Ms. Hines and Mr. Prescott simply does not satisfy this fundamental condition. As indicated by the plain language of LS–53 ¶ III, GFI clearly did not expect to be bound until it received written notice of award, *see Saul Bass*, 205 Ct.Cl. at 226–227, 505 F.2d at 1393 (intent is determina-

tive in the law of contracts), and that lack of intent is enough to preclude the formation of a binding contract by actual notice. As stated in *SCM Corp. v. United States*, 219 Ct.Cl. 459, 464, 595 F.2d 595, 598 (1979), "[o]ral understandings which contemplate the finalization of the legal obligations in a written form are not contracts in themselves. When legal obligations between the parties *will be deferred* until the time when a written document is executed, there will not be a contract until that time." (emphasis in original) (citations omitted).

Moreover, we have been unable to locate, and the defendant has not cited, any precedential authority for the proposition that an oral notice may create a binding contract under the circumstances present here. In view of the restrictions imposed by LS–53 ¶ III and FAR 14.407–1(a)(1), we therefore find that the telephonic notice of award was insufficient to create a binding contract because LS–53 does not explicitly provide for acceptance in this manner. *Cf. Ross Industries, Inc.*, ASBCA 19563, 75–1 BCA ¶ 11,212 (1975) (telephonic notice of award resulted in a valid, binding contract, but *only* because oral acceptance was allowed under the express terms of the solicitation). Thus, even though GFI was able to obtain award information by calling the USDA directly, the contract and the regulations at issue here emphatically establish that such actual notice did not give rise to a binding contract.[11]

From the foregoing we can reach several conclusions. First, GFI alleged the mistake at 2:35 p.m., more than one hour before the USDA accepted the bids at 3:38 p.m. on January 21, 1987. Secondly, the CO erroneously concluded that the mistake

---

F.2d 283, 286 (Fed.Cir.1987) ("*[c]ontra proferentum* applies when a contractor's reading of an ambiguous contract provision is reasonable in itself.") (citation omitted). Moreover, LS–53 ¶ III does not contain a patent ambiguity, and would not be excepted from the rule of *contra proferentum*. *See, e.g., American Bankers Life Assurance Co. of Florida v. United States*, 12 Cl.Ct. 166, 173 (1987) (the contractor must seek to clarify perceived ambiguities prior to executing the contract).

11. The defendant cites *National Movers Co. v. United States*, 181 Ct.Cl. 419, 386 F.2d 999

(1967), for the proposition that actual notice may be enough to create a binding contract. That case is inapposite for at least two reasons. First, the issue in *National Movers* was whether the bid had been accepted within the time specified in the solicitation, not whether an oral acceptance by telephone could be the basis for a binding contract. Secondly, the contract and the regulations at issue there did not explicitly call for the defendant to provide a *written* notice of award, a fact in direct contrast to the requirements of LS–53 ¶ III and FAR 14.407–1(a)(1).

was alleged after award, and proceeded to apply the wrong regulations when she analyzed the mistake in bidding claim under FAR 14.406–4. Thirdly, she should have examined the omission problem under the guidelines outlined in FAR 14.406–3, covering mistakes alleged before award. Fourthly, because of this error, we must apply that regulation *ab initio*. In doing so, however, we find that GFI failed to adduce sufficient probative evidence to demonstrate the existence of a mistake, and it is, therefore, not entitled to correct or withdraw its bid.

### 2. Is GFI Entitled To Relief Under FAR 14.06–3?

It is well established that the "acceptance of a bid containing a palpable, inadvertent, error cannot result in an enforceable contract." *Wender Presses, Inc. v. United States*, 170 Ct.Cl. 483, 486, 343 F.2d 961, 962–963 (1965) (citations omitted). Accordingly, GFI contends that no binding contract was created here because it should have been allowed to correct or withdraw its bid [12] under FAR 14.406–3. The relevant portions of that regulation provide as follows:

(a) If a bidder requests permission to correct a mistake and clear and convincing evidence establishes both the existence of the mistake and the bid actually intended, the agency head may make a determination permitting the bidder to correct the mistake; ...

(b) If (1) a bidder requests permission to withdraw a bid rather than correct it, (2) the evidence is clear and convincing both as to the existence of a mistake and as to the bid actually intended, and (3) the bid, both as uncorrected and as corrected, is the lowest received, the agency

head may make a determination to correct the bid and not permit its withdrawal.

(c) If ... (2) the evidence reasonably supports the existence of a mistake but is not clear and convincing, [the agency head] ... may make a determination permitting the bidder to withdraw the bid.

(d) If the evidence does not warrant a determination under paragraph (a) [or] (b) ... above, the agency head may make a determination that the bid be neither withdrawn nor corrected.

Thus, a mistaken bid may be corrected under FAR 14.406–3(a) only if *"both* the existence of a mistake and the bid actually intended" can be established by clear and convincing evidence. A bid may be withdrawn under FAR 14.406–3(c)(2) if the "evidence reasonably supports the existence of a mistake but is not clear and convincing." [13] The question, of course, is which standard applies to this case.

Here, the record shows that, if GFI had been allowed to correct its bid by increasing its all-beef bid prices on Invitation # 14 by $.11 per pound, it would have lost all 24 units because it would have been displaced as low bidder in each instance. Of course, GFI would also have been removed from contention if it had been allowed to withdraw those same all-beef bids. As a practical matter then, the results of a correction and a withdrawal would have been the same, and it is, therefore, not critical to distinguish between them at this posture. In substance, GFI is seeking to be excused from its contractual obligations relating to the all-beef bids as originally submitted, and thus we find that it only needs to meet the lower standard of proof. That is, the issue that we must address is—whether GFI has adduced "evidence reasonably sup-

**12.** GFI has at times alleged only that it was entitled to correct the mistaken bid, *see* Post Trial Memorandum of Law, pp. 6–8, while at other times it has argued that it was also entitled to withdraw its bid, *see* Post Trial Proposed Conclusions of Law, p. 10, ¶ 1; JX 1, Joint Memorandum of Stipulations and Issues of Fact and Law, p. 6, ¶ 3. Thus, even though GFI has not pursued its alleged right to withdraw with the same vigor that it has pursued a correction,

we think it is most prudent to analyze both options.

**13.** The Court of Claims has defined "reasonable" as "that which is proper, fair, equitable and honest in the judgment of a 'reasonable' man, and is suitable and appropriate to the end in view ... of the facts and circumstances." *National Steel & Shipbuilding Co. v. United States*, 190 Ct.Cl. 247, 267–268, 419 F.2d 863, 876 (1969).

port[ing] the existence of a mistake." Not surprisingly, GFI argues that the evidence of a mistake is clear and convincing, while the defendant contends that GFI has not proven the existence of a mistake by *any* quantum of evidence. However, we concur with the defendant and find that GFI has failed to establish the existence of a mistake by any measure of creditable proof.

### a. *The Lack Of Evidence Relating To Raw Beef Costs*

■ The starting point in our analysis is the most critical element in this dispute, the meat cost.[14] For guidance, we look to FAR 14.406–3(g)(2), which describes the sort of evidence that must accompany a petition to correct or withdraw a bid on the basis of a mistake alleged before award. It states, in pertinent part, that:

[A] request [to correct or modify a bid] must be supported by statements (sworn statements, if possible) and shall include all pertinent evidence such as the bidder's file copy of the bid, the original worksheets and other data used in preparing the bid, subcontractors' quotations, if any, published price lists, and any other evidence that establishes the existence of the error, the manner in which it occurred, and the bid actually intended.

Here, the CO advised GFI to submit such evidence in support of its claim that the all-beef bids on Invitation # 14 were $.11

per pound too low, albeit under the incorrect regulatory provision. *See* FAR 14.-406–4(e)(1). When GFI replied to this request on January 22, 1987, Mr. Goldberger reaffirmed the allegations that he and Mr. Prescott made the previous day, and which GFI asserted throughout trial, *see* Tr. p. 155, by stating that "Goldberger Foods made a mistake in calculating the price on the All Beef Patties. We left out of the bid price *all* of our manufacturing costs and margins above meat cost." PX 11 (emphasis added). GFI then attempted to prove its mistake and the bid actually intended through PX 13, which, as we have noted, contained GFI's file copy of the offer sheets for Invitation #'s 11 through 14 and explanatory spreadsheets prepared *after the fact* by Mr. Prescott.

In this connection, we find that only the GFI file copy of the Invitation # 14 bid is evidence of the type described in FAR 14.-406–3(g)(2). In other words, that solitary piece of paper was the only apparent pre-existing evidence in PX 13 that GFI actually used in preparing its Invitation # 14 bids on January 16, 1987, and all it showed was the raw beef prices provided to Mr. Prescott by Mr. Goldberger and the resulting meat cost calculations by Mr. Prescott. PX 13, p. 16. To compound matters, this sparse data consisted of nothing more than a few lines of scribbling as follows:

| 90's 50's | Loads | Cost Soy | M.U. | Cost 100% |
|-----------|-------|----------|------|-----------|
| 1.13/.51 | 5 | .7400 | + 11 | .975 |
| 1.15/.51 | 20 | .7500 | + 11 | .990 |
| | | | | .99 |
| | | | | .11 |

Mr. Prescott stated that this was the closest he ever came to preparing a "worksheet" when calculating LS–53 bids, and that this was all he used in computing the Invitation # 14 bids on January 16, 1987. This document totally fails to explain the

source of the raw beef prices charged by GFI for the 90% and 50% lean trimmings. Most importantly, however, GFI has *never* provided any documentary or corroborating evidence whatsoever to support its allegations that its suppliers actually quoted the

---

14. There is no serious dispute over the relatively fixed nature of the remaining two costs elements customarily included in the GFI bids. The freight expenses were approximately $.0450

per pound and the alleged mark up was $.1100 per pound, leaving the meat cost as the expense subject to the greatest speculation.

per pound prices found on the face of the Invitation # 14 offer sheet. GFI claims that it did not do so because it was under the impression that time was of the essence when it prepared and submitted PX 13 to the CO. This explanation is thoroughly self-serving and fails to pass muster for several reasons. First, we think it would have been relatively easy for GFI to obtain and submit sworn affidavits from its suppliers to the CO, as required by FAR 14.-406-3(g)(2). Those same prospective affiants should also have been called as witnesses at the trial by GFI, absent a stipulation. Secondly, the record shows that GFI supplemented the evidence before the CO on February 25, 1987, Tr. p. 682. Thus, the evidence is indisputable that it had more than enough time to obtain such sworn affidavits, and to provide further proof on the prices it actually paid for the 90% and 50% lean trimmings that it used to manufacture the single unit of soy patties awarded to it under Invitation # 14. Presumably, GFI would have been able to obtain the raw beef for its all-beef patties for at least the same cost, given the substantial additional volume that would have been required. Finally, and by far the most probative, GFI maintained extensive business records, and they certainly could have been adduced at trial to establish the prices quoted and paid for such raw beef. Not only did they fail to do so, no plausible explanation was proffered for such omission.

In this connection, we place heavy emphasis on the following testimony of Mr. Prescott:

Q: Mr. Prescott, what books and records does Goldberger Company keep with regard to expenses for purchases of beef?

A: We have our complete disbursement file, which would include the purchase orders where they're issued. We do issue them on most of our purchases. We also have a copy of our check that we've issued to the supplier. We have receiving report documents that are attached to that disbursement check copy, which would indicate the vendor, the lot number, the item number, the quantity, the weight. We would also have a bill of lading attached to that that came along with the shipment, as well as the vendor's invoice. There is also a weight sheet that we record when we receive the product that has the number, if it's accountables or boxes, the quantity of items received, as well as the weight.

Q: Did Goldberger Foods purchase any beef in response to a contract award for soy patties on Invitation # 14?

A: I'm sure we did.

Q: Do you have any business records which include what you identified that was for that purchase?

A: Not specifically. May I qualify it?

Q: Yes, sir.

A: The reason for that is that in that process we ask for price, we ask for a commitment, we ask for a timeframe of delivery. That customer, that vendor may, in fact, ship that product in to us under the terms that we've agreed upon. When we get that product, we may not be able to use it for government, because the graded rating service may disqualify it for certification.

THE COURT: Mr. Prescott, the question was whether or not you have any business records. You may answer that yes or [no].

THE WITNESS: Yes, we do.

 * * * * * *

Q: Did you consider supplying the Department of Agriculture with any business records to support your claim that an error occurred in your bid for Invitation Number 14 on 100 percent beef patties?

A: Other than those that we did supply?

Q: Yes.

A: No.

Tr. 678–680.

From the foregoing, it is clear that some raw beef was purchased to manufacture the soy patty unit awarded to GFI under Invitation # 14, and that any number of records in the "disbursement file" would have verified the cost of that meat. Similarly, these same records, if they had been

adduced, would have provided extremely probative circumstantial, if not direct, evidence of the raw beef prices that GFI would have paid to manufacture the 24 units of all-beef patties. We find GFI's unjustified failure to produce these records to be incredulous because of the criticality of such evidence. Even more shocking is the fact that GFI did not provide any reasonable explanation for this failure. Contrary to the explanation offered by Mr. Prescott, *see supra*, it is immaterial whether the meat purchased for the soy patties was actually used to manufacture them. We are concerned only with the prices quoted by the suppliers, and the prices that GFI would have been required to pay if it had manufactured the 24 units of all-beef patties. Undoubtedly, the disbursement records of GFI for the soy patties would have firmly established that figure.

Given the foregoing unexplained failures of GFI, we find that a *strong* adverse inference is warranted in this case. This is so because "a party's failure to bring forth evidence within [its] control, or to explain such omission, warrants an inference that the evidence, if proffered, would be unfavorable to his cause...." *Morowitz v. United States*, 15 Cl.Ct. 621, 631 (1988), citing *Interstate Circuit, Inc. v. United States Department of Treasury*, 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939); and *Lepkowski v. United States*, 804 F.2d 1310, 1323 (D.C.Cir.1986). Accordingly, we draw the inference that

GFI's failure to furnish any of its primary records was motivated by the negative impact that such records would have had on its alleged mistake claim. This necessarily leads to the inescapable conclusion that the raw beef prices listed on the face of the Invitation #14 offer sheet, PX 13, p. 16, were not the same prices that were quoted over the telephone to Mr. Goldberger by his suppliers. More specifically, we find that those records would show that GFI would not have been required to pay $1.13 and $1.15 per pound for its 90% lean trimmings and $.51 per pound for the 50% lean trimmings. Without any evidence to support the raw beef costs recorded on Invitation #14, GFI cannot prove that it "left out of the bid price all ... manufacturing costs and margins above meat cost." In short, the evidence unequivocally shows that GFI did in fact mark up five of its all-beef bids by *at least* $.0674 per pound, and the remaining 20 by *at least* $.0824, and it is that evidence which justifiably leads us to infer that GFI probably included the full $.11 per pound mark up.

In contrast to the raw beef prices that GFI claims it would have been required to pay to its suppliers, the record shows that the prevailing market prices for those products were substantially lower on or about January 16, 1987. In this regard, we note the following January 16, 1987 market prices, and the extended meat costs using the same formula employed by GFI on Invitation #14:

| 90's | 50's | Soy Cost | All–Beef Cost |
|------|------|----------|---------------|
| $1.0650 | $.4350 | $.6850 | $.9076 |

DX 107.

---

Obviously, the $1.0650 per pound market price for 90% lean trimmings and the $.4350 per pound market price for 50% lean trimmings were lower than the prices that GFI intended to use for the 90% (five loads at $1.13 and 20 loads at $1.15) and 50% ($.51 for all 25 loads) lean trimmings in Invitation #14. As a consequence, the intended GFI all-beef meat costs ($.9750 for five loads and $.9900 for the remaining 20)

were substantially higher than the costs it would have incurred with meat purchased at market prices. As GFI itself conceded, the market price per pound for all-beef meat at the time was $.9076, and it is, therefore, indisputable that the prices that GFI used in calculating its all-beef bids, *see* PX 13, p. 16, ranged from $.0674 ($.9750–$.9076) to $.0824 ($.9900–$.9076) over the

market price for a pound of all-beef hamburger.

Given the failure of proof as to the prices actually quoted to GFI by its suppliers, the strong adverse inference that must be drawn from the failure to produce the primary records that would have established those prices, and the failure to call its suppliers as witnesses, we hold that GFI was quoted prices no higher than the market prices listed for January 16, 1987. We also find that GFI chose not to use the prices quoted by its suppliers in computing its meat costs for Invitation # 14. Instead, it apparently decided to mark up the prices quoted for both types of raw material, and used a basis that was at least $.0674 to $.0824 per pound higher than its actual cost. These findings, of course, are *diametrically* opposed to GFI's assertion that it did not include *any* mark up whatsoever in its all-beef bids. In particular, we reference Mr. Goldberger's letter of January 22, 1987, where he stated that "Goldberger Foods ... left out of the bid price *all* of our manufacturing costs and margins above the meat cost." PX 11 (emphasis added). As we have amply demonstrated, GFI marked up five of its all-beef bids by at least $.0674 and 20 by at least $.0824. Moreover, we think it is entirely likely that the raw beef prices quoted to GFI by its suppliers were even lower than the market price in view of the substantial volume it would have been required to purchase, in which case the amount of mark up included in its basic meat costs would be even higher. Therefore, we hold, based on this record, that GFI did include a substantial portion, if not all, of its alleged $.11 per pound mark up for profit, overhead, and manufacturing costs.

In this context, we note that GFI argues that the bid announcement forms for Invitation # s 11 through 13 tend to show that GFI used prices that were higher than the market prices, and that the schedules prepared *after the fact* by Mr. Prescott tend to indicate that GFI added an $.11 mark up to those higher meat costs. *See* PX 13. However, in view of the lack of evidence establishing the prices actually quoted, the most critical element of proof in this matter, and the adverse inference that must be drawn from GFI's failure to produce available records to establish those costs, we find, on this record, that GFI would be "doubling up" its mark up if it were permitted to add another $.11 per pound. That is, using the market value as our guide, the actual mark up on the GFI all-beef bids would be between $.1774 ($.0674 + $.1100) and $.1924 ($.0824 + $.1100) per pound. Such a mark up is contrary to the position taken by GFI throughout these proceedings, and is simply not warranted by the evidence adduced here. Thus, we conclude as a matter of law that, even if the CO had applied the provisions of FAR 14.406–3, she would have found a complete lack of evidence to support a request to correct or withdraw the bid. Surely then we cannot find, on this record, that GFI's "evidence reasonably supports the existence of a mistake" where the probative evidence is substantially to the contrary.

### b. *Other Evidence Of The Alleged Mistake*

 Notwithstanding the foregoing lack of evidence, GFI seems to suggest that, so long as a bidder simply alleges a mistake in its bid to the CO before contract award, it cannot be held to that bid as a matter of law. *See* Plaintiff's Post Trial Memorandum of Law, p. 8. In support of this assertion, it cites to *Ruggiero v. United States*, 190 Ct.Cl. 327, 334–335, 420 F.2d 709, 713 (1970), which states that:

> [I]f a bidder discovers that [it] has made a mistake in [its] bid and so advises the contracting officer, even after bid opening, but before award, [it] is not bound by [its] bid. [citations omitted] ... *[W]hat we are really concerned with is the overreaching of a contractor by a contracting officer when the latter has the knowledge, actual or imputed as something he ought to know, that the bid is based on or embodies a disastrous mistake, and accepts the bid in face of that knowledge.*

(emphasis added).

This is, of course, a correct statement of the law. It does not, however, require us

to reach a different result because the CO did not "overreach" GFI. Contrary to plaintiff's suggestion, *Ruggiero* does not stand for the proposition that a contractor may be excused from his bid by merely averring that a mistake has been made. We think that the foregoing passage from *Ruggiero* implicitly demonstrates that the contractor will be allowed to correct or withdraw its bid only if it proves by the appropriate quantum of proof, first, that it made a palpable mistake, and secondly, that the CO had actual or constructive knowledge of that error at the time of contract award. The mere suggestion of error alone will not do. This conclusion is required by FAR 14.406–3, which was promulgated after, and thus not at issue in, the *Ruggiero* decision. FAR 14.406–3(d) clearly permits the CO to accept a bid as submitted unless the contractor meets one of the standards for correction or withdrawal outlined in FAR 14.406–3(a), (b), or (c). *See supra.* Thus, GFI, on the facts here, cannot be excused by simply alleging that it made a good faith error. At bar, it has failed to adduce any credible evidence in support of its claim, *see supra*, and we, therefore, find that the USDA had every right to accept the bid as submitted and to insist on receiving the benefit of its bargain.

Moreover, the record shows that the CO fulfilled her responsibilities in verifying GFI's all-beef bids before accepting them. It is settled law that a contractor alleging a mistake in its bid must point to evidence in the bid it submitted sufficiently serious to create a presumption of error and in turn to create a duty on the part of the government to verify the bid. *Wender Presses,* 170 Ct.Cl. at 486–487, 343 F.2d at 963. Here, after GFI advised the CO that it made a mistake in its all-beef bids, Ms. Cope thoroughly investigated that claim. *Cf. Wender Presses,* 170 Ct.Cl. at 486, 343 F.2d at 963 ("the test [for imputing constructive knowledge of a mistake to the CO is one] of reasonableness, *i.e.,* whether under the facts and circumstances of 'the particular case there were any factors which reasonably should have raised the presumption of error in the mind of the

contracting officer' . . . without making it necessary for the agency's experts in every case to assume 'the burden of examining every * * * bid for possible error by the bidder.' ") (citations omitted). It is true that she verified the bid pursuant to FAR 14.406–4, Mistakes after Award, but that was harmless error because she, nevertheless, correctly concluded that there was no mistake (PX 12), and GFI's failure to adduce reasonable evidence of a mistake at trial supports that determination. In other words, GFI failed to show the CO, as it failed to show us, "that the bid [was] based on or embodie[d] a disastrous mistake." *Ruggiero*, 190 Ct.Cl. at 335, 420 F.2d at 713. Consequently, we hold that, even though the CO had actual knowledge that GFI was alleging a mistake in its bid before the contract was accepted, there was no overreaching by the CO.

GFI, nevertheless, contends circumstantially that it has demonstrated the mistake to the CO and to the court by other criteria. As far as we can tell, it relies on the following factors in support of its mistake allegation:

1. GFI bid competitively only on soy patties under the previous 13 solicitations, and that pattern was contrary to the Invitation # 14 results;

2. There was a $.14 average margin between the GFI soy and all-beef bids on Invitation # 14, and this margin was narrower than the $.21 to $.23 margin under the previous 13 solicitations;

3. The $.14 margin between its soy and all-beef margins was narrower than the $.21 margin between the soy and all-beef bids of its competitors on Invitation # 14;

4. There was a $.1195 margin between the GFI all-beef bids on Invitation # 14 and the prevailing market prices on January 16, 1987, and this margin was narrower than the $.20 to $.24 margin under the previous 13 solicitations;

5. The $.1195 margin between its all-beef bids and the prevailing market price on January 16, 1987, was nar-

rower than the purchasing experience of the USDA under the previous solicitations; and

6. The GFI all-beef bids on Invitation # 14 were the lowest for every destination, lower, in fact, than competitors with the same or lower freight expenses.

We have examined each and every one of these factors very carefully, and we find that they do not prove by any creditable quantum of evidence that GFI made a mistake in its bid, particularly in the face of the record evidence and the want thereof discussed above. If the question before us was whether the evidence should have reasonably raised the presumption of error in the mind of the CO such as to create a duty to seek verification before awarding the contract, the type of situation typified by *Wender Presses*, 170 Ct.Cl. at 486–487, 343 F.2d at 963, these factors might carry more probative value than they do. That is not the issue before us, however, and the evidence adduced by GFI merely, and only, hospitably *suggests the possibility* of error; it does not *prove* that a mistake was in fact made. We view these indicia as circumstantial at best, and, in our opinion, they do not overcome GFI's failure to adduce the direct evidence of its meat costs that would have foreclosed any need to rely on these vague indications of a mistake. FAR 14.-406–3(c)(2) places the onus on GFI to produce at least a reasonable amount of creditable evidence in support of its mistake claim before it may be allowed to withdraw its bid, but the circumstantial evidence that it relies on does not fit the bill. It does not overcome the lack of *direct* evidence, nor the *strong* adverse inference that must be drawn from GFI's failure to adduce such direct evidence that was available to it. *See supra*. Indeed, it would be incongruous for us to find that GFI could prove its mistake by such circumstantial evidence when it failed to produce *direct* evidence in its control that would have unequivocally established the merits of its claim. We put no stock in Mr. Prescott's assertion that the factors related above, particularly the margins, were the best way that he knew

to demonstrate its mistake. *See* Tr. p. 161 As we have shown, that is simply not true.

### B. *Is The Alleged Mistake Compensable?*

 ■ In addition to concluding that GFI has failed to demonstrate the existence of an error, a conclusion that is enough to preclude recovery in and of itself, the evidence also supports a conclusion that GFI committed a noncompensable error in judgment. It is well established that relief is available *only* for those unilateral mistakes that result from "a clear cut clerical or arithmetical error, or misreading of specifications." *Aydin Corp. v. United States*, 229 Ct.Cl. 309, 314, 669 F.2d 681, 685 (1982) (citations omitted). The complete omission of a cost item from the bid calculation, such as the $.11 per pound omission alleged by GFI, may be such a mistake if it can be plausibly classified as the result of a clerical or arithmetical mistake, or the result of a misreading of the specifications. *See Bromley Contracting Co. v. United States*, 794 F.2d 669, 672 (Fed.Cir.1986) (citations omitted). However, it is equally settled that relief from an alleged unilateral mistake in bidding does not extend to errors in judgment. *Ruggiero*, 190 Ct.Cl. at 335, 420 F.2d at 713; *see also Liebherr Crane Corp. v. United States*, 810 F.2d 1153, 1157–1158 (Fed.Cir.1987); *United States v. Hamilton Enterprises, Inc.*, 711 F.2d 1038, 1048 (Fed.Cir.1983); *Aydin*, 229 Ct.Cl. at 314, 669 F.2d at 685. The reason for this rule is simple; errors in judgment are not "mistakes" in the true equitable sense of that concept, *see Ruggiero*, 190 Ct.Cl. at 335, 420 F.2d at 713, but rather, they involve a *"conscious* gamble with known risks." *Liebherr*, 810 F.2d at 1157 (emphasis added).

Therefore, under this caveat, relief is unavailable if the facts show that the contractor submitted the bid (*i.e.*, low) that it intended to submit which inaccurately gauged one or more of the variables involved in performance. Thus, relief has been denied where the contractor submitted the bid it actually intended, but alleged there was a mistake based on erroneous assumptions about specification requirements, *Liebherr*, 810 F.2d at 1157;

incorrect estimates on the number of man hours necessary to perform under the contract, *Hamilton*, 711 F.2d at 1047; inaccurate predictions on the availability and cost of bonding the job, *EDC/MTI Joint Venture*, ENG BCA 5631, 90–2 BCA ¶ 22,669 (1990); imprecise assessments on the difficulty of the work, *American Ship Building Co. v. United States*, 228 Ct.Cl. 220, 654 F.2d 75 (1981); miscalculations on the availability of tools or supplies, *Trio Machine Works, Inc.*, NASA BCA 480–6, 82–1 BCA ¶ 15,465 (1981), *aff'd*, 714 F.2d 161 (Fed.Cir.1983); and faulty appraisals on the cost of providing required supplies and equipment, *Superior Services*, ASBCA 28300, 84–3 BCA ¶ 17,547 (1984).

Based on the evidence adduced in this case, or the lack of evidence, we find that GFI submitted the bid that it intended to submit, and that its so-called mistake was a noncompensable error in judgment. GFI did not prove its actual meat costs by any reasonable quantum of evidence, having failed to proffer its business records or the testimony of its suppliers. This warranted an adverse inference that the meat costs alleged by GFI were not the costs that would have actually been incurred had it performed on the all-beef portion of the contract. The evidence showed that GFI would have been able to obtain its raw material at the lower market prices available on January 16, 1987, and that its all-beef bids were in fact marked up between $.0674 and $.0824 per pound. This leads us to reasonably infer that GFI *knowingly* decided, for whatever reason, to mark up its Invitation # 14 bids by at least the above amounts. This we find was a "conscious gamble with known risks" based on deliberate choices. For that reason, we find that the alleged mistake, to the extent that one was actually made, was a noncompensable error in judgment and not a clear cut clerical or arithmetical mistake. We now turn briefly to the question of damages.

### C. *Liquidated Damages*

■ GFI failed to deliver the 24 all-beef units by February 28, 1987, the deadline under Invitation # 14. Thus, under the general terms and conditions of USDA–1, Art. 68, ¶ (a)(2), PX 1, the CO issued a 10–day cure notice on March 4, 1987, PX 27, and subsequently terminated the contract under Art. 68, ¶ (a)(1) on March 26, 1987. A new solicitation was issued on March 27, 1987, and those 24 units were reprocured on April 1, 1987. PX 24. On June 15, 1987, the CO issued a demand letter claiming $79,930.65 in reprocurement costs and $42,768 in liquidated damages, totalling $122,698.65. PX 24; DX 135. On August 28, 1987, those amounts were offset against sums due GFI under a subsequent contract award. GFI does not dispute the amount of the reprocurement charges levied against it, but claims that the USDA unnecessarily delayed in reprocuring the 24 all-beef units, and therefore, that the $42,768 liquidated damages assessment was unreasonable.

Liquidated damages are often used as a method of encouraging timely performance, but they must be reasonable under the circumstances. *Rex Trailer Co. v. United States*, 350 U.S. 148, 151, 76 S.Ct. 219, 221, 100 L.Ed. 149 (1956). Reasonable means "that which is proper, fair, equitable and honest in the judgment of a 'reasonable man,' and is suitable and appropriate to the end in view of the facts and circumstances." *National Steel & Shipbuilding*, 190 Ct.Cl. at 267–268, 419 F.2d at 876. As stated in *Priebe & Sons v. United States*, 332 U.S. 407, 411–412, 68 S.Ct. 123, 126, 92 L.Ed. 32 (1947):

> When [liquidated damages provisions] are fair and reasonable attempts to fix just compensation for anticipated loss caused by breach of contract, they are enforced.... They serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts.... And the fact that the damages suffered are shown to be less than the damages contracted for is not fatal. These provisions are to be judged as of the time of making the contract....

*See also Jenni–O Foods v. United States,* 217 Ct.Cl. 314, 334, 580 F.2d 400, 413–414 (1978).

Of course, liquidated damages must be considered on a case-by-case basis. It is not inequitable or unreasonable to use a daily fixed rate to predict the loss. *Wise v. United States,* 249 U.S. 361, 39 S.Ct. 303, 63 L.Ed. 647 (1919). As a general proposition, such damages begin to accrue on the date of contract completion, but only if the government has acted reasonably in attempting to mitigate the costs to the contractor. Indeed, the right to claim liquidated damages may be waived if the government prevents or delays performance within the time stipulated by the contract. *Fortec Constructors v. United States,* 8 Cl.Ct. 490, 508 (1985) (citation omitted). Of course, the party alleging that the liquidated damages assessed are somehow inappropriate bears the burden of proving that they are excessive or unreasonable.

Here, the parties expressly agreed that serious damages would inevitably result from late shipments, and obviously from nonperformance, and that those damages would be uncertain, difficult to ascertain, and perhaps unmeasurable. In this regard, USDA–1, Art. 67 states, in part, that:

(b) The following shall apply to late shipments:

(1) Late shipment ... will cause serious and substantial damages to Agency because of its urgent need for timely performance, but it will be difficult to prove the amount of such damages.

\* \* \* \* \* \*

(3) In the event Agency exercises its right of termination in whole or in part ... Contractor shall be liable to Agency for excess costs ... and, in addition, for liquidated damages. Liquidated damages are assessed at the daily rate specified in the announcement against the quantity of commodity not shipped by the final shipment date under the contract as fixed and agreed. *Liquidated damages are payable for each day of delay, until such time as Agency ob-*

tains or could have obtained shipment of a similar commodity elsewhere.

(4) *It is mutually agreed that such damages are a reasonable estimate of the probable actual damages for delay in shipment. In no event shall liquidated damages be imposed for more than 45 days of delay except where mutually agreed upon between Contractor and Agency.*

(emphasis added).

Pursuant to this contract provision, the relevant case law, and the facts of this case, we find no problem with the liquidated damages imposed by the CO. There is simply no evidence that the USDA engaged in any unreasonable delay in initiating the reprocurement of the 24 all-beef units. USDA–1 required Ms. Cope to issue a cure notice, which she did just six days after GFI missed the February 28, 1987 deadline for performance, and that notice obligated her to wait 10 days before taking further action. She terminated the contract just 13 days later, on March 26, 1987, and we cannot say that this passage of time was unwarranted. There the reprocurement proceeded with reasonable dispatch; the solicitation was issued on March 27, 1987, and the replacement contracts were awarded on April 1, 1987. Those awards directed the successful bidders to make delivery "as soon as possible but not later than April 25, 1987." PX 26. Under these circumstances, we find that the defendant was diligent in its attempt to mitigate the damages to GFI, and that the liquidated damages assessed by the USDA were reasonable.

## CONCLUSION

For all of the reasons expressed above, we find that GFI failed to establish by the requisite quantum of proof that it omitted $.11 per pound from its all-beef bids. In addition, we find that GFI's alleged error was one of judgment and, therefore, noncompensable. Consequently, GFI is not entitled to relief. The Clerk shall enter judgment in favor of the defendant. No costs.

IT IS SO ORDERED.

## APPENDIX A
### MEAT COST CALCULATIONS

The following example uses the market costs for 90% and 50% lean trimmings on January 16, 1987, *see* DX 107, the day on which GFI prepared and submitted its bid on Invitation # 14. It demonstrates the algebraic formula employed by Mr. Prescott in calculating the meat costs for all-beef and soy, *see* PX 13, PX 64, and PX 65.

A. An all-beef patty is composed of 80% lean meat, and its per pound cost is calculated by using this formula:

| | Market Price/Pound | % of the Product Used | Cost |
|---|---|---|---|
| 90% Lean Trimmings | $1.0650 | .75% | $.7988 |
| 50% Lean Trimmings | $ .4350 | .25% | $.1088 |
| Total Meat Cost/Pound For All–Beef Patty w/80% Lean Beef = | | | $.9076 |

B. A soy patty is only 80% beef, and that meat is in turn only 75% lean. Its cost is calculated by using this formula:

| | Market Price/Pound | % of the Product Used | Cost |
|---|---|---|---|
| 90% Lean Trimmings | $1.0650 | .625% | $.6656 |
| 50% Lean Trimmings | $ .4350 | .375% | $.1631 |
| Total Meat Cost/Pound For 75% Lean Beef = | | | $.8287 |
| 75% Lean Meat | $ .8287 | .80% | $.6630 |
| Hydrated Soy | $ .1100 | .20% | $.0220 |
| Total Meat & Soy Cost/Pound For Soy Patty = | | | $.6850 |